**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JEAN McGOWAN,

Plaintiff-Appellant,

v.

No. 04-7083

CITY OF EUFALA, a municipal
corporation, MAYOR BILLY RAY
DAY, in his official and individual
capacities, and CHAD FRENCH, in
his individual and official capacities,

Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CV-03-4-W)**

---

N. Kay Bridger-Riley, Bridger-Riley Bailey & Associates, P.C., Tulsa, Oklahoma
for Plaintiff-Appellant.

Stephen C. Lewis, United States Attorney's Office, Tulsa, Oklahoma, for
Defendants-Appellees.

---

Before **McCONNELL**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

A prisoner at the Eufala, Oklahoma city jail committed suicide while under Appellant Jean McGowan's supervision as jailer. McGowan was later suspended for thirty days without pay after a three-month investigation by the City and the Oklahoma Bureau of Investigation concluded that she had failed to carry out her legal duty to conduct regular visual inspections of the prisoner, and that she falsified the written records of her inspections. McGowan claims in this Title VII suit that the City retaliated against her for supporting the race discrimination allegations of a co-worker. She appeals the district court's order of summary judgment on her Title VII retaliation claims against the City and several of its officials. Because we agree with the district court that her claims lack sufficient evidentiary support, we affirm.

## I. Background

The background facts are taken from the complaint and materials submitted in summary judgment proceedings.

Jean McGowan was employed by the City as a police dispatcher and jailer. Hired in 1983, her employment was uneventful until sometime in 1999 when then Chief of Police Randy Johnston approached McGowan and attempted to enlist her aid in an investigation of Officer Sherman Lollis. Lollis was a black police officer who had filed an EEOC discrimination claim against the City in March, 1999. McGowan refused to help Johnston in his investigation and in fact

supported Lollis in the race discrimination lawsuit he eventually filed against the City. Lollis and the City settled that litigation in October 2001.

McGowan claims because of her support of Lollis, Johnston and other officers in the Eufaula Police Department retaliated against her. McGowan claims numerous instances of retaliation or harassment. We briefly summarize them and the City's response:

(1) After Lollis's complaint against the City, Chief Johnston began complaining about McGowan in front of and to other dispatchers. He asked that McGowan's mistakes in completing her time slips be reviewed by another dispatcher and brought to his attention. McGowan concedes, though, that Johnston's predecessor, Billy Ray Day, also had time slips reviewed by other dispatchers. Johnston claims he did not order the practice and had it discontinued when he became aware of it.

(2) McGowan claims her son, Ronnie McGowan, and his girlfriend, Linda Shepard, have also been the target of harassment by members of the department. Officer Chad French first issued a citation to McGowan for two unleashed dogs belonging to Ronnie McGowan and Shepard. A warrant was later issued for Ronnie McGowan and Shepard on charges relating to the citation. Johnston personally served Shepard with her warrant at McGowan's residence. Later, French allegedly tried to have McGowan's pickup truck impounded after he arrested Ronnie McGowan and Shepard for attempting to evade him as he sought

to detain Shepard on an outstanding warrant for assault and battery. Chief Larry Osmond (who took over shortly after Johnston's resignation in 2002) intervened and ordered that the truck be returned.

(3) Next, McGowan claims that Officer Wesley Dawson trespassed on McGowan's property to take a picture of an unleashed dog on her property. The case was forwarded for criminal trespassing charges to the District Attorney, but charges were never filed.

(4) McGowan claims she was denied compensatory time for hours she missed after leaving work early one evening. Other department employees had similar complaints during Johnston's tenure as Chief. The acting Chief upon Johnston's departure, Lt. Charles Hammett, gave McGowan credit for all her claimed compensatory time.

(5) At a meeting of officers and dispatchers, Johnston allegedly looked at McGowan and said that he didn't want "the damn bill collectors" calling the department anymore. McGowan's creditors had, in fact, called the department. Vol. II at 173.

(6) McGowan was denied a requested assignment to the day shift and regular weekends off despite her seniority in the department. Johnston testified that McGowan was not assigned to the day shift because (a) counsel advised the City not to place her with Lollis until after his lawsuit was settled, and (b) because day shift dispatchers had to do more clerical work than those on other

shifts and McGowan's clerical skills were not up to par. McGowan provided an affidavit by Johnston in which he states that day shift dispatchers do not actually need to have better clerical skills than dispatchers on other shifts, which contradicted an earlier affidavit by Johnston and his deposition testimony. Other dispatchers testified that they thought McGowan's clerical skills were poor and that she would not be able to be successful on the day shift. McGowan had previously unsuccessfully applied for the day shift during Day's tenure as chief, before Lollis filed his Title VII claim. Day denied this earlier application because he perceived that McGowan did not possess what he considered the requisite clerical and computer skills.

(7) While on duty, McGowan received a complaint from Shepard alleging that Officer French was following her. After McGowan recorded the call in the department's log book, French berated McGowan. She also alleges that French continued to make derisive comments about her work over the police radio.

In the end, Chief Osmond dismissed McGowan on September 13, 2003, one day after she gave deposition testimony in this case. The City claims McGowan's firing was the result of a three-month investigation into circumstances surrounding the suicide of a prisoner being held in the City's jail on June 14, 2003. In that incident, Officer Dawson arrested a man and delivered him to the City jail, failing to remove the prisoner's belt per department policy. McGowan was the jailer on duty that day. State law required McGowan perform a series of

visual inspections of the prisoner and his cell to ensure his safety and well being. During the course of McGowan's shift, the prisoner hanged himself with his belt.

By reviewing videotape of the jail from the day in question, Osmond determined that McGowan did not perform the required inspections and, in fact, falsified a log book to make it appear as though she did. McGowan maintains that she performed the required checks and that the videotape of the day in question had been tampered with. Osmond suspended Dawson for his role in the prisoner suicide and terminated McGowan. Osmond claimed the difference in Dawson's and McGowan's punishment was justified by their relative culpability for the suicide and his belief that McGowan lied during the investigation. The firing was later overturned by the Eufaula City Council, and McGowan was instead given a thirty-day suspension and probation, the same punishment as Dawson.

## II. Standard of Review

We review a district court's decision granting summary judgment de novo. Summary judgment is appropriate only if the pleadings, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). We resolve all factual disputes and draw all reasonable inferences in favor of the non-moving

party. To determine whether genuine issues of material fact exist for the jury, the court may "consider only the evidence that would be available to the jury." *Id.*

### III. Discussion

To establish a prima facie claim under Title VII for retaliation, a plaintiff must establish three elements: (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Argo*, 452 F.3d at 1202.[1] Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1316 (10th Cir. 2006). If there is reason to believe the employer's reasons are pretextual, the case may be submitted to the jury.

The district court concluded that McGowan met the first element—her support of Lollis's discrimination claim was protected activity. But the court found that McGowan failed to establish the second and third elements of a prima

---

[1] After the case was at issue on appeal, the United States Supreme Court decided *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006), subjecting a challenged adverse employment action to a standard of reasonableness. We resolve this appeal under the new standard.

facie case because (1) the refusal to grant the shift change or remedy work place harassment were not adverse actions; and (2) the City's reasons for suspending her were legitimate, and therefore, she could not show a causal connection between the allegations of retaliation and her suspension.

McGowan argues that the district court erred in not finding the denial of shift assignment adverse, as well as discounting the cumulative affect of her working environment. She also claims the City's reason for suspending her was pretextual.

We address each of these claims in turn.

## A. Adverse Employment Action

McGowan maintains that the City retaliated in three ways to adversely affect her employment: (1) it suspended her; (2) it failed to reassign her from the night shift to the day shift; (3) it sanctioned harassment by members of the police department, which, in the aggregate, constituted a hostile work environment.[2] According to the district court, the evidence did not support the conclusion that the second or third actions by the City constituted an adverse employment action.

---

[2] The City concedes, of course, that McGowan's termination (later modified to a suspension) was a materially adverse action. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) ("Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn.").

A challenged employment action is adverse for the purposes of a claim for retaliation under Title VII if "a reasonable employee would have found [it] materially adverse." *Mickelson*, 460 F.3d at 1315. As the Supreme Court put it in *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006), an employer's action is adverse under Title VII if it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Applying this standard, the Court held that a jury could reasonably find a material adverse action under Title VII where an employee was involuntarily transferred from a job as a railroad forklift operator to a less desirable position as a track laborer, even though the duties of both positions were similar. *Id.* at 2416–18.

After *Burlington Northern* we have continued to examine claims of adverse action through a "case-by-case approach, examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (internal quotations and citations omitted). The materiality of a claimed adverse action is to be determined objectively; "petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination." 126 S. Ct. at 2415. The Supreme Court further noted, however, that "[c]ontext matters." *Id.*

In a recent case applying the *Burlington Northern* standard, we found that the "prospect of losing wages, benefits, and ultimately a job" would dissuade a

reasonable worker from supporting a charge of discrimination. *Mickelson*, 460 F.3d at 1316. Even prior to *Burlington Northern*, we found adverse action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different [job] responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (internal citations and quotations omitted). Examples of adverse action from our pre-*Burlington Northern* cases include: (1) the transfer of an experienced female police detective to a position in the police academy after the detective filed an EEOC complaint due to "concern for her safety," *Duncan v. Mgr., Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1307 (10th Cir. 2005); (2) issuing written reprimands where those reprimands made it more likely that a complaining employee could be fired, *Roberts v. Roadway Express*, 149 F.3d 1098, 1104 (10th Cir. 1998); and (3) management's goading of an employee's co-workers into filing a false criminal complaint against him, *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986–87 (10th Cir. 1996).

Since McGowan's termination was obviously an adverse action, we turn to her claim that the City also took materially adverse action by (1) failing to assign her to a day shift, and (2) sanctioning workplace harassment by her co-workers.

*1. Eligibility for Day Shift*

-10-

McGowan contends the failure to reassign her to the day shift is a materially adverse action. The district court disagreed, finding her preference for the day shift "a mere inconvenience or an alteration of job responsibilities" that was not actionable, relying on *Sanchez v. Denver Pub. Sch.*, *supra*, 164 F.3d at 532 (holding that teacher transfer not adverse).

The question, then, in the wake of *Burlington Northern*, is whether a reasonable person would be deterred from making or supporting a discrimination claim if she knew she would be denied a shift change. Here, the answer is no, because on this record the claim fails the test of materiality. While McGowan may have desired a change in shift, she identified no specific rationale for the transfer other than an undefined subjective preference for the change. In fact, the shifts offered no differences in pay and benefits, nor was the night shift more arduous. Although claiming it to be a better assignment, her stated desire for change was purely for personal reasons. Moreover, before Lollis filed his claim, Day had refused to transfer her to the day shift because she lacked the necessary administrative skills. Finally, the record does not indicate that McGowan was permanently denied a shift change. The City's legal counsel advised that the status quo be maintained during the pendency of Lollis's lawsuit, which settled several months after McGowan requested the change. Nothing in the record suggest that McGowan requested a shift change or that one was denied after Lollis's suit settled.

-11-

As the Supreme Court observed, "reassignment of job duties is not automatically actionable." *Burlington Northern*, 126 S. Ct. at 2417. Absent evidence of materiality, McGowan has not presented a claim for a jury. In sum, we agree with the district court that on these facts the challenged action was not materially adverse.[3]

## 2. *Employee Harassment*

McGowan also contends that the City sanctioned work site harassment by her supervisors and fellow employees. McGowan asserts this harassment created a hostile work environment that itself constituted a materially adverse action. As discussed above, the complained-of harassment must be sufficiently severe to qualify as a materially adverse action under Title VII. In addition, to succeed on a retaliation claim based on a hostile work environment, a Title VII plaintiff must present evidence that supervisory or management personnel either (1) orchestrated the harassment of the plaintiff by other employees, or (2) knew about the harassment and acquiesced in such a manner as to condone it. *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998). The behavior complained of must render "the workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[3] Even if we were to assume under *Burlington Northern* that McGowan has successfully alleged a materially adverse action, as we discuss below, the City had a legitimate reason to deny her transfer.

environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). The district court concluded none of the allegations supported a finding of a hostile work environment.

We agree that McGowan has not met her burden of showing that the harassment she complains of amounted to a materially adverse action. For the most part, the harassing behavior by line officers was not directed at McGowan, but rather at her son and his girlfriend. The record shows the harassing behavior discontinued when brought to the attention of the police chief. The record does not support a conclusion that harassment was orchestrated by supervisory personnel or that the City tacitly approved of it. Additionally, many of McGowan's allegations such as her complaints regarding the highlighting of her time slips and French's petty criticism of her work are of a trivial nature and do not rise to a claim of an "abusive" materially adverse work environment.

In conclusion, the record does not contain disputed facts sufficient to show that the conduct of the City created a hostile work place sufficient to constitute a materially adverse action under Title VII.

## B. Causation

We now turn to whether McGowan has established disputed material facts on the third element of a Title VII claim—whether a causal connection exists between the protected activity and the materially adverse action. According to the district court, McGowan provided no direct or circumstantial evidence

-13-

showing that her support of Lollis was the cause of the adverse employment actions. Since only her termination-turned-suspension and (for the sake of argument) her day shift claims qualify as materially adverse actions, we examine those next.

### 1. *Termination/Suspension*

McGowan argues the City suspended her for supporting Lollis's discrimination claim. The district court concluded that because the suspension came over two years after her support of Lollis and was based on a legitimate reason (her responsibility for a prison suicide), McGowan had failed to show the requisite causal connection. McGowan claims she has demonstrated circumstantial evidence of causation by alleging in her amended complaint that she was fired the day after giving a deposition in her Title VII lawsuit. We agree.

Testifying in a Title VII lawsuit—including one's own—can be protected activity. *See* 42 U.S.C. § 2000e-3(a); *see also Robbins v. Jefferson County Sch. Dist.*, 186 F.3d 1253, 1258 (10th Cir. 1999) (acknowledging that Title VII extends protection to those who testify in proceedings related to their own Title VII action even if the action is without merit); *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 413 (4th Cir. 1999) ("[I]t is [] plain that testifying in a deposition in a Title VII case generally constitutes protected activity under [Title VII's] participation clause.").

Moreover, the required link between the protected activity and subsequent adverse employment action can be inferred if the action occurs within a short period of time after the protected activity. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) ("Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."); *Haynes v. Level 3 Commc'n*, 456 F.3d 1215, 1229 (10th Cir. 2006) (quoting *O'Neal* for same proposition). Here, McGowan was fired the day after she gave deposition testimony in this case. While proximity alone may not always support an adverse inference of retaliation, McGowan's deposition testimony containing allegations of wrongful conduct by current police department employees suffices to establish an inference of causation.

Having found sufficient circumstantial evidence of causation, we turn to the remaining analysis under the *McDonnell-Douglas* framework. Where a Title VII plaintiff has made a prima facie case of discrimination, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action taken against the plaintiff. *McDonnell-Douglas*, 411 U.S. 792, 802 (1973).[4]

---

[4] It is worth noting that while timing can suffice to support a prima facie case of discrimination, it will not satisfy a Title VII plaintiff's burden to respond to an articulated non-discriminatory reason for the challenged adverse employment action. *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th

(continued...)

The City provided two related non-discriminatory reasons for firing McGowan—(1) a prisoner suicide that occurred on her watch as jailer, and (2) McGowan's perceived dishonesty in the investigation following the suicide. McGowan responds that the City's proffered non-discriminatory reason for terminating her was actually a pretext for discriminatory behavior. She claims that pretext can be inferred in two ways: (1) she was treated differently than a similarly situated officer who booked the prisoner involved in the suicide, and (2) the stated reasons for her firing by Chief Osmond were not sincere.

***Disparate Treatment.*** McGowan argues she was treated differently than Officer Dawson, the jailer who booked the prisoner who hanged himself, but failed to remove the prisoner's belt. To show disparate treatment, McGowan must establish she was similarly situated to Dawson in all relevant respects. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Id.* In determining whether two employees are similarly situated, a "court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Id.* Moreover, even employees who are similarly situated must have

---

⁴(...continued)
Cir. 2001).

been disciplined for conduct of "comparable seriousness" in order for their disparate treatment to be relevant. *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

Applying this standard, McGowan was not similarly situated to Dawson. Although they both reported to Osmond and monitored prisoners in the City jail, their jobs that night were very different. Dawson was the booking officer, while McGowan was the jailer. He admitted the prisoner, she ultimately was responsible for his safety.

In addition to having different responsibilities, McGowan and Dawson engaged in different conduct and made different mistakes that contributed to the suicide. First, McGowan was obliged under state law and City policy to visually observe prisoners. Based in part on an independent investigation by the Oklahoma Bureau of Investigation (OSBI), Osmond determined that McGowan, as jailer, was more culpable in the hanging than Dawson, the booking officer. Dawson was found to have violated an internal police department policy, in failing to remove the prisoner's belt at booking, but Osmond concluded Dawson was truthful and cooperative in the OSBI investigation. McGowan, by contrast, was found to have violated both state law and City policy,[5] falsified the jail

---

[5] The City found that McGowan had violated the Oklahoma Jail Standards Act, 74 Okla. Stat. § 192, and Oklahoma State Department of Health Jail Standards Chapter 670 § 310:670-5-2, which requires jailers to conduct regular visual inspections of prisoners in their custody. McGowan was determined to

(continued...)

-17-

register regarding her visual inspections, and been uncooperative during the OSBI investigation.

In sum, because McGowan and Dawson were (1) not performing the same job, (2) not subject to the same policies, statutes and findings of wrongdoing, and (3) different in their relative level of culpability, they were not similarly situated. Additionally, even if they were similarly situated, McGowan's conduct was not sufficiently similar to Dawson's to allow an inference of pretext on the basis of their disparate treatment.

***Proffered Reasons.*** In an attempt to show the City was insincere in finding her more culpable, McGowan argues that Osmond lied about his reasons for the termination. In a letter recommending her termination, he stated that McGowan attempted to deceive OSBI investigators regarding the number of times she checked on the prisoner in person. She maintains that the OSBI report does not conclude that she lied to investigators.

We find the OSBI report and Osmond's letter to be consistent. The report stated McGowan told investigators she had conducted two or three in-person checks of the prisoner in the four hours between his booking and the discovery of his body. The report also noted that Oklahoma law and regulations required at least one in-person check per hour by the jailer on duty. Osmond's letter cited

[5](...continued)
have performed inspections by means of closed-circuit television, despite her entries in the prison register indicating otherwise.

the report and concluded on the basis of the report and evidence from the department's jail video of the day in question that McGowan had not made a physical inspection of the prisoner's cell until four hours after she came on duty.

Osmond also based his decision to fire McGowan on McGowan's admitted failure to make the required four in-person hourly checks on the prisoner. Nothing in the record suggests this rationale was insincere. In other words, the City's proffered non-retaliatory reason was not "so incoherent, weak, inconsistent, or contradictory that a rational fact finder could conclude the reason[] was unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004). Accordingly, McGowan has not shown that the City's non-discriminatory reason for her discharge was pretextual.[6]

In sum, we agree with the district court that McGowan did not show disputed facts that would establish pretext based on disparate treatment.

### 2. Reassignment.

McGowan's only other claim of adverse action is the City's failure to reassign her to the day shift in May of 2001. Even assuming an adverse action exists, McGowan must still satisfy the causation element. In support of causation,

---

[6] It is worth noting that the ultimate decision maker over McGowan's employment was not Osmond but the City Council. Upon its review of Osmond's recommendation of termination, the Council eventually concluded that a suspension was more appropriate punishment. In the end, McGowan received a thirty-day suspension and probation, the same punishment as Dawson.

she points to evidence that the City refused to assign her to the day shift because it meant she would be working with Lollis.

The City argues that the refusal was proper for two reasons. First, its legal counsel defending the Lollis lawsuit advised it not to put Lollis together with a potential witness while the lawsuit was pending. Second, it was a legitimate business decision to separate McGowan and Lollis during that time.

We agree that the City's temporary refusal to approve a shift change upon the advice of legal counsel in this case was not impermissible retaliation. Title VII prohibits adverse action "based on a *retaliatory motive* and [that] is reasonably likely to deter the charging party or others from engaging in protected activity." *Burlington Northern*, 126 S. Ct. at 2411 (emphasis added); *see also* EEOC Compliance Manual § 8 D-3. We thus look to *motive* in addition to consequences. If the reason for the claimed adverse action does not flow from a discriminatory motive, it lacks the requisite causal connection to the adverse action. Here, it was entirely reasonable for an employer in the City's legal circumstances to follow the advice of counsel regarding McGowan's shift assignment during the pendency of Lollis's litigation. The City was faced with a discrimination claim by an employee who already worked the day shift. McGowan sought a shift change to work with Lollis, whose claim she was actively supporting. The City through its counsel merely acted to maintain the status quo, a natural response to the lawsuit. Nothing in the record suggests the

City's action was the result of retaliatory intent or was anything more than a necessary consequence of its defense of litigation.

To be sure, an employer cannot immunize itself from Title VII liability by following the advice of its lawyers. Still, given the facts of this case, the City was not required to compromise its defense of Lollis's claims simply to accommodate McGowan's subjective desire for a change in shifts. In sum, this record does not support a conclusion that the City's reason for denying McGowan a shift change was pretextual. The City's temporary refusal to grant McGowan's request for a shift change was perhaps *reactive*, but cannot be said on this record to have been *retaliatory*.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.