**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KAMEISHA HAMILTON,

      Plaintiff - Appellant,

v.

BOISE CASCADE EXPRESS, a
division of Boise Cascade Office
Products, a corporation; SAMANTHA
MOHR; ROBERT HARPER,
individually; LAURIE JOHNSON,
individually; BOISE CASCADE
OFFICE PRODUCTS
CORPORATION,

      Defendants - Appellees.

Nos. 06-6235 and 06-6256
(D.C. No. 04-CV-266)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **EBEL**, and **McCONNELL**, Circuit Judges.

Plaintiff-Appellant Kameisha Hamilton appeals from the grant of summary

judgment in favor of her former employer and certain employees,

Defendant-Appellees Boise Cascade Express ("Boise"), Samantha Mohr (site

manager), Robert Harper (district sales manager), and Laurie Johnson (human

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

resources manager), on her race discrimination claims under Title VII and 42

U.S.C. § 1981. Our jurisdiction arises under 28 U.S.C. § 1291,[1] and we affirm.


Background

Plaintiff began her employment with Boise on March 24, 2003. Beginning

in late April or early May, Plaintiff had a number of appointments with her

physical therapist and physician that required her to miss some of her 7:30 a.m. to

4:30 p.m. shift. Although the exact times of the appointments are not found in the

record, Plaintiff admitted that she was never at an appointment before 8:00 a.m.

or after 5:00 p.m. Aplt. App. at 1365. The offices of her physical therapist and

physician are located 40 minutes and one hour from her workplace, respectively.

See id. at 1365–66. Plaintiff admitted that, for example, to arrive at a 4:00 p.m.

physical therapy appointment, she would have to leave at 3:20 p.m. at the latest to

arrive on time. See id. at 1365. Plaintiff attended a number of appointments on

---

[1] Defendants argue that the notice of appeal filed on July 14, 2006, is untimely to appeal the district court's judgment against the Plaintiff entered on January 19, 2006. See Fed. R. App. P. 4(a)(1)(A) (notice of appeal must be filed within 30 days after judgment). This contention is meritless given that a joint stipulation of dismissal of the remaining parties and their claims was not entered until June 19, 2006, well after the January 19, 2006 judgment. See Fed. R. Civ. P. 54(b). Defendants argue that because they modified the caption in their pleadings to delete the settling plaintiffs, and the district court followed entering judgment with a similar caption, the January 19, 2006 judgment was final. We disagree. Nothing suggests that the caption had ever been properly amended, or that a final judgment over all the parties was entered prior to the stipulation of dismissal of the remaining parties. See Beugler v. Burlington N. & Santa Fe Ry. Co., 490 F.3d 1224, 1227 n.1 (10th Cir. 2007).

days when she was scheduled to work.

Another associate complained to a supervisor that Plaintiff was not working the whole day, which the supervisor confirmed. See id. at 245. Subsequently, the human resources manager, Laurie Johnson, reviewed Plaintiff's time sheets, phone records, and key fob records (records of when an employee's badge was swiped to enter the building), and concluded that Plaintiff had inaccurately reported her time on the following dates: May 1, May 22, May 30, June 2, June 11, June 12, June 16, and June 20, 2003. See id. at 251–55. On June 23, 2003, Robert Harper, a sales manager but not a supervisor over Plaintiff, invited Plaintiff to a meeting in Ms. Johnson's office where Ms. Johnson told Plaintiff the purpose of the meeting was to discuss her excessive absenteeism and time card fraud. Ms. Johnson showed Plaintiff her phone records and time sheets saying that she committed time card fraud. See id. at 1353. At the end of the meeting, Ms. Johnson told Plaintiff her employment was being terminated because she committed time card fraud. See id. at 1354.

Plaintiff filed this lawsuit alleging in her complaint that she was fired because of her race.[2] Defendants filed a motion for summary judgment which the district court granted. Hamilton v. Boise Cascade Express, No. 04-266, 2006 WL 149023 (W.D. Okla. Jan. 19, 2006). On appeal, Plaintiff argues that fact

---

[2] Originally, the lawsuit involved four other plaintiffs who have all settled their claims with Defendants.

- 3 -

questions regarding Boise's belief that Plaintiff engaged in time card fraud should have precluded summary judgment.[3]

Discussion

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1112 (10th Cir. 2007). Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, to survive summary judgment a non-moving party must put forth sufficient evidence—more than a scintilla—such that a reasonable jury could find in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). We view the facts in the light most favorable to the non-moving party. Scott v. Harris, 127 S. Ct. 1769, 1774 (2007).

Where a plaintiff relies on indirect or circumstantial evidence to show

---

[3] We note that Plaintiff's briefs fail to conform to the requirements of Federal Rule of Appellate Procedure 28(a)(7) and (e) in the statement of facts and citations to the record. It is inappropriate to reproduce verbatim the voluminous facts from summary judgment pleadings and not pinpoint cite to the appendix. See 10th Cir. R. 28.4; Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006). Despite these deficiencies, we will still address the merits of Plaintiff's appeal. See MacArthur v. San Juan County, 495 F.3d 1157, 1161 (10th Cir. 2007).

- 4 -

discrimination under Title VII, we examine the claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006). First, the plaintiff must establish a prima facie case of discrimination. See id. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the termination. See id. If the defendant meets its burden, the burden shifts back to the plaintiff to show that the defendant's "proffered justification is pretextual." See id.

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). Although we do not require "pretext plus," specifically that a plaintiff demonstrate that the reason was false and a motive for discrimination, the falsity combined with other circumstances in the case must permit the inference that unlawful discrimination was a motivating factor in the decision. Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir. 2005). In determining whether the proffered reasons were pretextual, we consider the facts as they appear to the decisionmakers and consider whether they honestly believed those reasons and acted upon them in good faith. See Young, 468 F.3d at 1250.

Assuming, arguendo, that Plaintiff has established a prima facie case, Boise's proffered non-discriminatory reason is that it terminated Plaintiff's

- 5 -

employment because she committed time-card fraud. Plaintiff argues that there is a fact question concerning pretext when the facts are viewed collectively. Plaintiff contends that other employees were not disciplined as she was, that her time-card entries were merely erroneous, not fraudulent, and that a statement by Valetta Wright demonstrates that management did not believe that she engaged in time-card fraud. We are not persuaded.

Insofar as evidence of pretext is based upon disparate treatment, Plaintiff points to vague testimony that other employees with different supervisors also had unspecified attendance issues but were treated differently. However, this evidence falls far short of showing that new employees with approximately 90 days of employment under the same supervisor with similarly egregious reporting problems received more favorable treatment. See McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006). No evidence supports this angle. Moreover, Plaintiff maintained that there were no errors on her time cards and has no explanation for the many inconsistencies. Aplt. App. at 545, 1365.

Plaintiff also relies on a statement by Valetta Wright, a former plaintiff, which she put forward to the district court for the first time in her Surreply in Opposition to Summary Judgment, to which Boise had no chance to respond before summary judgment was rendered seven days later. Ms. Wright testified at her deposition: "I remember that [Mr. Harper] said to me after they investigated that they don't believe that [Plaintiff] intentionally was fraudulent on her time

card. . . . And [Ms. Johnson] was right there." Id. at 1665. Mr. Harper was not

one of the decisionmakers—the decision was made by Ms. Johnson, Ms. Mohr,

and Diane Wiley, the area human resources manager. See id. at 238. Plaintiff

does not contest this and testified that he did not speak during the meeting. See

id. at 1353. We have doubts whether this statement would be admissible, but

even if it were admissible, the outcome is the same. Ms. Wright testified that Mr.

Harper made this statement the day following Plaintiff's termination, but she also

testified that the day of Plaintiff's termination Ms. Johnson and Mr. Harper stated

that Plaintiff had committed time-card fraud. See id. at 1679–80. Further, the

decisionmakers Ms. Mohr and Ms. Johnson testified that they believed that the

evidence showed, and Plaintiff admitted, that she recorded substantial time that

she did not work, and the record evidence fully corroborates this determination.

Boise maintains that Plaintiff missed 64 hours of unscheduled work during her

first three months and that her absences should have been reported as unpaid, as

Plaintiff lacked any paid time off. Even giving Plaintiff the benefit of every

possible doubt, meaning that Boise gave her credit for working through nearly

every lunch hour, there were still 10 hours of unaccounted time for which

Plaintiff was paid.[4] Aplt. App. at 1962. Ms. Mohr specifically testified that

---

[4] Ms. Mohr testified that Plaintiff "was not terminated for filling out her timesheet incorrectly on a daily basis. For example, recording 8 hours when she only worked 7 or really worked 9. Had her total hours worked added up to the right amount at the end of the week, she would not have been disciplined." Aplt. App. at 1962 (emphasis in original).

It wasn't necessary for her to admit to, quote, fraud. It was necessary for her to admit that she knew the time sheets were wrong. Whether she equates that with fraud or not, frankly, wasn't relevant. . . . What I know is that she had admitted to physically not being at work and the information on the time sheets being incorrect.

Id. at 1231. The fact that Boise may have more generously characterized Plaintiff's conduct after the fact does not make a case for pretext especially in light of Ms. Mohr's testimony that the distinction now used was irrelevant and the overwhelming evidence that Boise's given justification was reasonable.

The importance of the distinction between time-card fraud and time-card mistakes, based on Ms. Wright's testimony and relied on by the dissent, is based on the assertion that Boise would be able to bypass progressive discipline if Plaintiff's conduct was fraudulent but not if it was merely mistaken. However, Plaintiff has pointed to no evidence in the record supporting this assertion, and the record does not bear it out. Boise had a progressive discipline policy that would be triggered, for example, by attendance or performance issues. Id. at 269, 303. However, a violation of a core value of the company, which includes integrity, safety, and quality improvement, id. at 280, is an exception to the progressive discipline policy and may result in immediate termination, id. at 269, 303. Integrity issues include "when [employees] are paid for hours worked during which they were not at work." Id. at 1961. An employer could reasonably conclude that these material deviations resulting in Plaintiff being paid for time she did not work raise an issue of integrity making progressive discipline

- 8 -

unwarranted. The record clearly shows that Boise terminated Plaintiff for integrity issues and not for absenteeism. Id. at 1961–62. Thus, Ms. Mohr testified that it did not matter how Plaintiff's conduct was characterized because no one doubted that the conduct implicated integrity concerns. See id. at 1231. Neither Plaintiff nor the dissent has pointed to any evidence in the record supporting even the slightest inference that Boise characterized Plaintiff's conduct as time-card fraud to deprive her of progressive discipline. Boise's characterization of Plaintiff's conduct is certainly reasonable, and hardly a "disturbing procedural irregularity" sufficient to prove pretext. See Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1119 (10th Cir. 2007) (quotations omitted). Our role is "not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." Dillon, 468 F.3d at 1250 (quotations omitted).

The dissent argues that the fact that Boise disciplined three African-American women around the same time supports an inference of unlawful discrimination. While evidence of a statistical correlation may create an inference of discrimination, here the evidence is too flawed to raise a jury question because it fails to compare similarly situated individuals or eliminate nondiscriminatory explanations for the disparate treatment. See Furr v. Seagate Tech., Inc., 82 F.3d 980, 986–87 (10th Cir. 1996).

Although this circuit has rejected a "pretext plus" standard, there are cases

- 9 -

where it simply would not be permissible to infer discrimination from the evidence the plaintiff has mustered to show that the employer's proffered reason was false. See Reeves, 530 U.S. at 148. We believe that this is one of those cases. Mr. Harper's opinion (if it were admissible), and Ms. Johnson's presence when he expressed it, may provide a scintilla of evidence that Boise's explanation for terminating Plaintiff was false. But we conclude that on this thin basis—and in the face of overwhelming evidence that Plaintiff was terminated because of unexplained, inaccurate time-keeping—no reasonable jury could find in Plaintiff's favor. See Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1168 (10th Cir. 2007).

Finally, contrary to Plaintiff's suggestion, Plotke v. White, 405 F.3d 1092 (10th Cir. 2005), is not almost directly on point here. It is true that we are skeptical of "subjective evaluations in making termination decisions," id. at 1106, but Boise relied on documentary evidence to conclude that Plaintiff could not have worked all the time she recorded on her time sheets, even assuming she worked through her lunches, Aplt. App. at 545. In addition, none of the other evidence supporting our conclusion in Plotke is present here. See 405 F.3d at 1103–08 (relying on, for example, the proffered reason for termination was generated only after the termination, and the defendant likely fabricated evidence relating to the termination).

AFFIRMED. Plaintiff's motion to amend the caption to omit Plaintiff

Danielle Callaghan as a party due to settlement is GRANTED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

<u>Hamilton v. Boise Cascade Express</u>, Nos. 06-6235, 06-6256
**EBEL**, Circuit Judge, dissenting.


Plaintiff-Appellant Kameisha Hamilton claims Defendants fired her because of her race. Defendants—Boise Cascade Express and three of its managerial employees—assert that they, instead, terminated Hamilton's employment because they believed, in good faith, that Hamilton had committed time card fraud. The district court granted Defendants summary judgment. The specific question before this court now on appeal, therefore, is whether Hamilton presented evidence calling into doubt Defendants' good-faith belief that she committed time card fraud sufficient to survive summary judgment. Because I conclude she has, I would reverse summary judgment entered for Defendants.[1]

_____

[1]I agree with the majority that we have appellate jurisdiction because Hamilton filed a timely notice of appeal following the district court's June 19, 2006, decision dismissing with prejudice the remaining claims and plaintiffs involved in this litigation. Although neither party argues it, there is another jurisdictional question lurking here, however, because the district court's otherwise final June 19 decision retained jurisdiction to enforce settlement agreements involving Defendants and several other plaintiffs. This court has never considered whether such an order is sufficiently final to provide appellate jurisdiction under 28 U.S.C. § 1291. I would conclude it is, so long as the order is otherwise final and retains jurisdiction only to enforce a settlement agreement. See <u>Futernick v. Sumpter Twp.</u>, 207 F.3d 305, 310 (6th Cir. 2000) (holding that the "district court's retention of jurisdiction to enforce the terms of a settlement agreement" did <u>not</u> "render[] an otherwise final judgment non-final" because the judgment in essence "resolved all issues on the merits and effectively ended the litigation"); <u>see also</u> <u>Bourg v. Cont'l Oil Co.</u>, No. 98-30572, 1999 WL 684161, at *2 & n.3 (5th Cir. Aug. 13, 1999) (unpublished); <u>cf.</u> <u>Brandner Corp. v. V-Formation, Inc.</u>, 98 Fed. App'x 35, 37 (2d Cir. 2004) (unpublished) (referring to district court's order resolving all remaining claims as a "final" order, despite its retention of jurisdiction to enforce settlement, without specifically addressing whether that order was in fact final for 28 U.S.C. § 1291 purposes). <u>See</u>

The evidence in the record, viewed in the light most favorable to Hamilton, as the nonmoving party, see Moore v. Bd. of County Comm'rs, 507 F.3d 1257, 1258 (10th Cir. 2007), indicates the following: Hamilton was fired during a meeting with Defendants Laurie Johnson, the office human resources manager, and Robert Harper, a mid-level manager. Johnson told Hamilton, during this meeting, that she was fired because Hamilton had committed time card fraud. Nevertheless, the next day Harper stated to Hamilton's immediate supervisor, in front of Johnson, that "[w]e do agree with you that Kameisha did not purposefully falsify her timecard."

The majority, like the district court, discounts Harper's statement because he was not one of the people who made the decision to fire Hamilton. While that appears to be true, it is not dispositive in this case.[2]

---

generally Cusumano v. Microsoft Corp., 162 F.3d 708, 710, 712 (1st Cir. 1998) (noting "[i]t is settled law that a court's retention of jurisdiction in order to facilitate the consideration of possible future relief does not undermine the finality of an otherwise appealable order"); 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3915.3 (2008) (noting many district court "[r]eservations or conditions are compatible with finality;" for instance, "[a] judgment that expressly retains jurisdiction to enter merely ministerial orders . . . can be final"); 36 C.J.S. Federal Courts § 424 (noting that "[t]he fact that a judgment is subject to reservations or conditions does not automatically deprive the judgment of finality").

[2]The majority, without further explanation, "doubts whether [Harper's] statement would be admissible." I harbor no such doubts at this stage of the litigation. First and foremost, Defendants have never objected to this statement's admissibility. While they admittedly had a limited opportunity to object to this evidence in the district court, because Hamilton submitted this evidence in her surreply opposing summary judgment, Defendants could have challenged its

The district court determined that the decision to fire Hamilton was made by three people: 1) the general manager of Boise's Norman, Oklahoma, office, Defendant Samantha Mohr; 2) Johnson, the human resources manager for that office; and 3) Boise's regional human resources manager, Diane Wiley. The majority agrees. The evidence supports this conclusion and Defendants have never disputed it.

But the evidence in the record, viewed in the light most favorable to Hamilton, see Moore, 507 F.3d at 1258, further indicates that Harper, a mid-level manager, was actively involved in the investigation of Hamilton's time records. Harper was one of only three district sales managers in Boise's Norman office. Each of these three managers supervised several "teams" of sales representatives, such as Hamilton; each sales team was, in turn, directly supervised by a team leader who reported to one of the three district sales managers.

Although Harper was not Hamilton's second-level supervisor, he had been watching her attendance for several weeks, apparently because Hamilton had missed a number of days of work. On one occasion while Harper was checking to

admissibility on appeal, but did not. Because there is no specific objection to this evidence, it is difficult to address its admissibility in such a vacuum. But, if the majority is concerned that Harper's statement might be hearsay, Hamilton has all along argued that Harper's statement is not hearsay, but instead is admissible as a statement of a party opponent, made by Boise's agent, Harper. As such, it arguably would be admissible. See Fischer v. Forestwood Co., No. 06-4121, 2008 WL 2009866, at *8-*9 (10th Cir. May 12, 2008) (applying Fed. R. Evid. 801).

see if Hamilton was at work, another of Hamilton's team members complained to Harper that Hamilton had been leaving work early. Harper informed Hamilton's district sales manager, Larry Woods.

Mohr, Woods and Johnson met over a weekend to review Hamilton's time records, finding discrepancies. Because Mohr and Woods were scheduled to be out of town on business the following week, Mohr asked Johnson and Harper to meet with both Hamilton and Hamilton's direct supervisor, Valetta Wright.

Harper and Johnson first met with Wright. It was Harper who took the lead in talking to Wright, questioning her about Hamilton's time records and informing her that "we" had been investigating the matter for a week or two.

Harper and Johnson next met with Hamilton. Although Harper escorted Hamilton to Johnson's office and stayed during their meeting, he did not speak. During this meeting, Johnson fired Hamilton. Later that day, Hamilton telephoned her direct supervisor, Wright, to apologize, telling Wright that she had not done anything intentionally.

That afternoon, Harper and Johnson again met with Wright. Wright told Harper and Johnson about the call she had received from Hamilton. At the conclusion of that meeting, Harper and Johnson suspended Wright with pay and sent her home while they investigated further. Johnson and Harper then "continued to look through all the documents we had as well as other time sheets on Ms. [Wright's] team to verify, to research, to ensure no other time card fraud

- 4 -

was taking place."

The next day, Harper and Johnson called Wright back into work to meet with them again. It was Harper who opened the meeting by informing Wright that "[w]e do agree with you that Kameisha didn't purposely falsify her timecard." Wright understood Harper's reference to "we" to mean Harper and Johnson, who was also present at this meeting.

This evidence, viewed in the light most favorable to Hamilton, indicates that Harper was actively involved in investigating Hamilton's time records, both before and after her termination, and was in a position to observe Boise's decisionmakers and to know on what evidence they relied to fire her. In light of that, Harper's assertion, made in front of one of the decisionmakers, that "[w]e agree with you that Kameisha didn't purposely falsify her timecard," calls into doubt Defendants' good-faith belief that Hamilton committed time card fraud. This lingering doubt enables Hamilton to survive summary judgment.

The majority further discounts Harper's statement to Wright by blurring the distinction between time card fraud and time card mistakes. It has been Boise's theory throughout this litigation that it fired Hamilton for time card fraud, rather than for simply making mistakes in reporting her time. Boise's managerial employees have consistently stated that Hamilton was fired for fraud. And Hamilton, too, reported that Defendants cited fraud as the reason they terminated her employment.

Boise has characterized Hamilton's conduct as fraudulent, rather than mistaken, because under the terms of its personnel manual, Boise could fire Hamilton immediately for fraud, as it did, but would have had to invoke progressive disciplinary measures instead if she had only made mistakes in reporting her time.[3]  This appears true even though Hamilton was still a probationary employee at the time she was fired.

Moreover, there is evidence in the record from which a jury could conclude that Hamilton had only made mistakes in reporting her time, and had not committed fraud.  Many Boise employees who were trained at the same time Hamilton received her "new-hire" training were confused about how to complete their time sheets.  During training, new hires were told that if they had to leave work an hour early one day to attend, say, a medical appointment, the employee could make up that time by working through lunch another day during that same

---

[3]Boise's progressive discipline policy provided that it would fire an employee for integrity issues, such as fraud.  The majority asserts that Boise "could reasonably conclude that these material deviations resulting from being paid for time she did not work raise an issue of integrity making progressive discipline unwarranted."  It might be true that Boise could have deemed mistakes made in completing time cards to rise to the level of an integrity issue.  But Boise never made that argument here.  Rather, Boise has, all along, indicated that it fired Hamilton for fraud.

The majority asserts that "Mohr testified that it did not matter how [Hamilton's] conduct was characterized because no one doubted that the conduct implicated integrity concerns."  But what Mohr said was, it did not matter how Hamilton characterized her reporting errors, because Boise considered those errors to be fraudulent.

week.  The employee had to get her supervisor's approval before doing so, however.  The human resources office instructed employees that if they made up missed time in this manner, the employee should simply record on her time sheets that she worked eight hours on each of these days, even though the employee had actually worked, for example, seven hours one day and nine hours another.  In Hamilton's case, both Wright and another sales representative testified in their depositions that Hamilton had been working through her lunch hours to make up time she had missed, although this would not have been sufficient to make up all the missed time because the make-up time had to occur during the same week that the hours were lost.

Finally, the majority concludes that, even if there is evidence suggesting that Defendants' proffered reason for terminating Hamilton—their good-faith belief that Hamilton committed time card fraud—is false, "this is one of those cases" "where it simply would not be permissible to infer discrimination from the evidence [Hamilton] has mustered to show that the employer's proffered reason" for terminating Hamilton "was false."  The majority explains that, despite the fact that Harper's statement to Wright, made in front of Johnson, "may provide a scintilla of evidence that Boise's explanation for terminating [Hamilton] was false[,] . . . on this thin basis—and in the face of overwhelming evidence that [Hamilton] was terminated because of unexplained, inaccurate time-keeping—no reasonable jury could find in [her] favor."

In addition to evidence creating a disputed issue of fact as to whether Defendants' proffered reason for terminating Hamilton was false, however, the record contains other evidence that supports Hamilton's allegation that Defendants were acting with a racially discriminatory animus when they fired her. Johnson met with three employees on June 23, 2003, the day she fired Hamilton. By the end of that day, Johnson had fired one employee (Hamilton) and suspended the other two before eventually disciplining them. All three of these employees are African-American women. The adverse employment actions taken against these three women, on a single day, caused several other sales representatives, both black and white, to complain to the human resources department that there was at least an appearance of racial discrimination stemming from these and other disciplinary actions. This evidence supports Hamilton's assertion that there was a racially discriminatory atmosphere at Boise's Norman office. This, coupled with evidence from which a jury could find that Defendants' asserted reason for firing Hamilton—time card fraud—was false, would "permit the inference that unlawful discrimination was a motivating factor" in Defendants' decision to fire Hamilton.

For these reasons, I would reverse summary judgment entered for Defendants. I would do so reluctantly because the evidence suggesting that Hamilton did in fact commit time card fraud is quite strong. It is likely that, in the face of that evidence, a jury considering the merits of Hamilton's

discrimination claims would conclude that she had in fact committed fraud in recording the time she worked. But at this stage of the litigation, our review is governed by summary judgment principles. <u>See</u> Fed. R. Civ. P. 56(c). And those principles require that, because Harper's statement is sufficient to create a genuinely disputed issue as to whether Defendants had a good-faith belief that Hamilton committed time card fraud at the time they fired here, Hamilton is entitled to have a jury decide her race discrimination claims.