O’BRIEN, J., Circuit Judge,
dissenting:
The undisputed evidence in this case does not raise a material issue of disputed fact regarding pretext. Accepting as true Potter’s version of all disputed issues, she fails to show disparate treatment or Talley's lack of credibility in justifying the termination of her employment. Sifting through her plentiful allegations to reach the factual core of her claims, her e-mails dictate the outcome — she pushed too hard, crossed the line, and was fired for doing so. Because she fails to present any evidence to cast doubt, I respectfully dissent.
Disparate Treatment
Potter bears the burden of showing a weakness, implausibility, inconsistency, or contradiction in Synerlink’s “claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief.” Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1113 (10th Cir.2007). My colleagues conclude her evidence is sufficient for trial on her claim that gender played a significant role in her termination. But our focus should be narrow, deciding whether there is a genuine factual dispute as to the only material fact of significance: whether her insubordinate and insulting conduct was of “comparable seriousness” to that of her male counterparts, which was tolerated. See McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir.2006) (“[Ejven employees who are similarly situated must have been disciplined for conduct of ‘comparable seriousness’ in order for their disparate treatment to be relevant.”).
According to Potter, the male TMs were allowed to confront and argue with Tarp-ley regarding territory adjustments, but when a woman took the same approach, “that was over the line.” (Appellant’s Br. 31.) However, contrary to the Majority’s reading of the testimony, I find no support for Potter’s contention that her “approach” was similar to the male TMs.
A comparison of the male TMs’ testimony as to the substance of Potter’s e-mails is enlightening. As Irons testified, “I butt heads with everybody.... I’m a guy who likes to talk things out.... I would ask the question, what’s the reasoning ... in an inquisitive way, not a challenging way.” (App’x Vol. II at 603.) And as Hopkins testified, he would discuss territory changes with management, typically resulting in “negotiations.” (Id. at 617.) *684 While he would express concerns regarding future opportunities for commission growth and the growth of the company, he explained it “was always a trust factor,” and in his experience, things had “worked out.” (Id. at 619.) The majority concludes this testimony shows the male TMs, “like Potter, ... raised concerns, negotiated and challenged Synerlink’s management.” (Majority Op. at 17.) But the record shows Potter did much more than “raise concerns” and “negotiate” regarding changes in her accounts.
Even though Potter may have begun her objections to management’s request for her to transfer accounts to Dutton in a conciliatory manner in December 2006, (“let’s look at it again in a few months”), by April 2007, her e-mails went far beyond negotiations or straightforward discussion. She not only criticized management’s decisions (“Now, I can look forward to being rewarded for my efforts by being penalized with a potential territory reduction and commission cut because a new salesman was hired prematurely?”), but objected to any negative consequences to her bottom line that the management’s decision may impose, (“I am not in favor of handing over pieces of my territory just because the decision to hire him may have been a gamble.”). (App’x Vol. II at 650; Appellee’s Supp. App’x Vol. I at 121, 129.)
By June 2007, the e-mails from Potter had criticized Tarpley personally for events spanning years, criticized the company’s honesty with employees, criticized other employees’ work, and only grudgingly agreed to discuss matters, but on her own terms[1] — “If I’m forced to waive a white flag to prove I’m a team player and help my fellow TM, I will consider doing it.” (Id. at 12B (emphasis added).)
By all accounts the tone, tenor, and tempo of Potter’s tirades were unprecedented. So were her insubordinate accusations and insults. The substance of her e-mails speaks for itself. Even she had to admit in her deposition, “I’m not aware of anyone who had the same type of conversation I had with [Tarpley].” (Supp. App’x Vol. I at 63.) And Roberson testified: “Nobody *685 ever came on as strong in writing as what Stacey did. Those string of e-mails start in April, May, June of '07. Nobody in the history of our company had ever come on that strong attacking so many people in our company.” (App’x Vol. II at 586.) Potter’s expression of her opinions in her emails is a far cry from professional conversations regarding negotiations and shared concerns described as the approach taken by Irons and Hopkins.
This is not a mere difference in degree, but a difference of kind. Potter provided no evidence of other TMs engaging in conduct “comparatively serious” in their discussions with management. There are no disputes about material facts, and no weighing of the evidence is required. An undifferentiated analysis of the facts should not force a barely plausible case to go to trial. Lacking hard evidence, the majority retreats to generalities. But generalizations do little to inform the debate; focused and particularized attention to the facts is required. “Where the record taken as a whole could not lead a rational trier of fact to find for the [party claiming injury], there is no genuine issue for trial.” Matsushita Elec. Indus. Co v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538, (1986) (quotations omitted). “[M]etaphysical doubt as to the material facts” is not enough. Id.
Male TMs may have questioned management decisions and pushed back to some degree on decisions affecting them, but there is no evidence (as Potter is obliged to produce) that their actions came even close to Potter’s critical, obnoxious, insulting, and accusatory behavior. The devil is in the details, which the majority studiously avoids for obvious reasons: there are none showing male TMs’ behavior to be equivalent to Potter’s. Syner-link’s management hired Potter over a male applicant, went out of its way to help her succeed and applauded her success. Things were rosy until Potter was asked to make a sacrifice for others in the company, as others had done for her. Only then did it turn ugly. Fairly regarded, the established and undisputed facts support neither an inference of discrimination nor of pretext on the part of Synerlink. Potter was sacked because her behavior descended to a level that was both unprecedented and unacceptable. The anti-discrimination statutes should provide protection, not preference. Protected class members ought not to be insulated from the consequences of their intemperate behavior under the guise of fair and equal treatment.
Employer Credibility
Contrary to the Majority’s conclusion, the substance of Tarpley’s rewritten notes is immaterial to the district court’s grant of summary judgment. Tarpley’s conduct during discovery surely raises questions about his integrity generally. In many circumstances, this type of dishonesty may preclude summary judgment. But as the Majority recognizes, there must be a “specific basis for impeachment” before summary judgment is denied. See TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1158 (Fed.Cir.2004) (“Type-Right points to a number of facts that raise doubts as to the credibility of the proffered evidence”) (emphasis added); EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 56 (1st Cir.2002) (“Credibility issues such as the sincerity of an employee’s religious belief are quintessential fact questions.”); Cameron v. Frances Slocum Bank & Trust Co., 824 F.2d 570, 575 (7th Cir.1987) (“[0]n the current record, [the witness’s] credibility is a matter of legitimate inquiry. The possible inconsistency with respect to his description of his visitation practice is cer *686 tainly a matter for legitimate exploration.”).
Here, the judge’s summary judgment conclusion was not based on Tarpley’s disputed counselling sessions with Potter. Rather, Synerlink relied on contemporaneous documents, many written by Potter, as the foundation for its employment decision. Neither the notes offered in discovery, nor the conversations they allegedly reflected, were offered as evidence.
Tarpley’s affidavit in support of summary judgment states in relevant part:
The company terminated Plaintiffs employment for legitimate, nondiscriminatory, business-related reasons — namely, and as evidenced by the tone of Plaintiffs own e-mails to management shortly before the termination, Plaintiffs failure to work as a team player regarding, among other things, redistribution of accounts among the Territory Managers .... [and]
(App’x Vol. I at 327.)
The ‘last straw5 for me was an email from Plaintiff to me dated June 9, 2007....
(Id. at 333.)
The primary reason I terminated Plaintiffs employment was based on Plaintiffs ongoing failure to work as a team player, an issue which culminated in a series of combative emails sent by Plaintiff to me and other members of management in June of 2007.
(Id. at 334.)
Potter claims Synerlink’s “official version” for her termination was based on Tarpley’s notes which falsely indicated Potter had been counselled about being a team player. But this does not matter. Even if we accept as true that Tarpley lied and had not counselled Potter prior to December 2006, this fact does not negate the reason Synerlink proffers for her termination. See Outlaw v. Newkirk, 259 F.3d 833, 838 (7th Cir.2001) (no genuine issue of fact when “defendants would be entitled to summary judgment even assuming the truth of [plaintiffs] version of the incident”). Thus, whether Potter was counselled during 2004, 2005, or early in 2006, does not raise a genuine dispute of material fact precluding summary judgment.
Synerlink’s justification for Potter’s termination relied solely on the substance of the e-mail correspondence, conversations between December 2006 and June 2007, and the reasonable inferences flowing therefrom. As a result, Tarpley’s credibility regarding his notes or the number of times Potter was counselled is not the issue. When Potter was terminated, her e-mails over the previous months undeniably reflect dissatisfaction, “disappointment,” and distrust. The e-mails written by both Tarpley and Potter explicitly discuss the team-player concept. Potter’s emails further demonstrate, at least during the six months before her termination, she was not a willing team player — “If I’m forced to waive a white flag to prove I’m a team player and help my fellow TM, I will consider doing it.” (Supp. App’x Vol. I at 123-24 (emphasis added).) And while Potter argues “no reasonable juror could find that Tarpley was offended by the [June 9, 2007] e-mail,” her written words show otherwise. “In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision” not “the plaintiffs subjective evaluation of the situation.” E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir.2011) (quotations and citations omitted). The e-mails, considered in their entirety, are offensive. Potter has introduced no equivalent work correspondence among or between anyone at Synerlink which would establish the *687 content of her e-mails as normal communications between the TMs and management.
Based on the undisputed facts, no jury could reasonably find Tarpley’s reasons for terminating Potter’s employment were pretextual. I would affirm the judgment of the district court.
I, alone, am responsible for the delay in resolving this matter.

. For example, in a June 7 e-mail, she wrote, "If you [Tarpley] are the President] of PSA and have no authority over SynerLink nor the Buy/Resell companies, ... who can verily the commissions to be paid to the TM’s going forward? You said in the conference call that nothing would change, but it seems to be changing at least in interpretation.” (Supp. App’x Vol. I at 129.) Her follow-up e-mails continued to reject Tarpley's assurances her commissions would continue. On June 9, she complained, "You say they have flourished because of the sacrifices they made? You said they have been rewarded. No one has talked to me about the rewards, just the sacrifice. What would be my reward? Since no one around here communicates about plans for the future, and seems to keep all plans very secret, it seems to me there are none and what I may give up today is gone without exchanges.” She later wrote, "I know as long as I work at PSA I will always just be a worker bee, here to do as I'm told. As much as I love it here and often feel like I get 'buy in' on certain things, I’m not stupid — I know at the end of the day, I’m not on the board of directors, I’m not the CEO, I’m not family, and my request or opinion means virtually nothing.” (Id. at 123-24). At the same time she was criticizing management’s strategy, transparency, and honesty, she targeted other employees. As to one employee, she asked Tarpley, "Did you or did you not tell him that I would be responsible for setting margins and selling prices for [this customer]? You said you told him, so why would he do this? Is he deaf or just stupid?” (Id. at 125.) Discussing the accounts which had gone to Dut-ton, she dismissed the contributions of another employee, saying, "I realize Earl gave 80% of his accounts to Gary. Politically, it looks very generous.” (Id. at 123 (emphasis added).) And in regard to her estimate of the work of another TM, she suggested his client should be given to Dutton because his failure to work the client made it "low hanging fruit," but then asked "[o]r is it one of the untouchables?” (Id. at 124.)