**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LINDA M. PIERCY,

        Plaintiff-Appellant,

    v.

TERRY MAKETA, as Sheriff of El
Paso County Sheriff's Office, EL
PASO COUNTY SHERIFF'S
OFFICE, and THE BOARD OF
COUNTY COMMISSIONERS OF
THE COUNTY OF EL PASO,

        Defendants-Appellants.

No. 05-1192

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 03-N-2311 (CBS))**

---

Stefan Kazmierski, Roseman & Kazmierski, L.L.C., Denver, Colorado, for
Appellant.

Jessica Kyle Muzzio (Gordon L. Vaughan with her on the brief) Vaughan &
DeMuro, Colorado Springs, Colorado, for Appellees.

---

Before **BRISCOE**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

    Linda Piercy sued the El Paso County Sheriff's Office and several of its

employees, alleging sex discrimination and retaliation. The district court granted

the defendants' motion for summary judgment, finding (1) no causal connection between a complaint Piercy filed with the Colorado EEOC and her termination that would support the retaliation claim, and (2) no adverse employment action that would support the sex discrimination claim.

We affirm the district court's grant of summary judgment on the retaliation claim, but reverse and remand for further proceedings on one aspect of the discrimination claim—Piercy's allegation that she was precluded from transferring to El Paso's male-only jail.

## I. Background

In 1996, Piercy was hired as a Deputy Sheriff at the Colorado Springs jail (CJC). She claims that after her hiring, she and her female coworkers experienced sex discrimination in the workplace, primarily in the form of discriminatory practices that prevented women from getting desirable shifts, transfers, and break times. At the time, the El Paso County Sheriff's Office (EPSO) had two jails. CJC was a general facility housing both male and female inmates. Metro Jail was a maximum security facility housing only male inmates.

EPSO's practice was to classify prisoners based on the inmates' sex and security level. Thus, for example, women prisoners would be housed in Alpha 3, the female ward in CJC. That ward is a large, open unit with no separation of prisoners based on seriousness of offense, mental illness, or security risk. As a result, Piercy claims that Alpha 3 is a more difficult ward to work than some of the other wards at CJC. Metro, on the other hand, houses only male inmates in

-2-

separate cells, and its inmates are not allowed in open areas after curfew. Piercy alleges work in Metro can be less stressful and safer because the inmate population is smaller and does not have direct access to staff at all times.

Piercy also complains that certain job duties are restricted by the sex of an employee. For example, women are allowed to work in Alpha 3 by themselves, but men can work there only if accompanied by another deputy sheriff (male or female). Male deputies in CJC are not allowed to pat down female prisoners, conduct checks in the female cells, or enter a female cell without another deputy present. By contrast, female deputies have no such restrictions in the male wards. Because of staffing allocations, women are often required to work in Alpha 3 alone, which means they are not allowed to bid for shifts in other areas, despite any seniority they might have. Also, although males are not allowed to work alone in Alpha 3, they are allowed to escort female prisoners to other parts of the prison without another escort.[1]

In late August 2002, the allegedly discriminatory practices came to a head when EPSO posted a job opening to work at Metro Jail, stating that "Unfortunately, at this time, only requests from male deputies will be accepted." R. at 89. About the same time, a series of events commenced that ended in Piercy's termination.

---

[1] Piercy claims these policies differ from other prison systems. She conducted an informal survey of Colorado jails in November 2001 and concluded the majority of other facilities did not share the same policies as EPSO.

*First Tongue Stud Incident.* On August 1, 2002, one of Piercy's supervisors, Lieutenant Paula Presley, saw Piercy wearing a tongue stud. Presley believed the stud was a dress-code violation and asked Piercy's immediate supervisor, Sergeant Matthew Kortrey, to address the issue.

Kortrey met with Piercy to discuss EPSO's dress code policy, but the parties dispute what Kortrey told her about the tongue stud. Kortrey claims that when he initially approached Piercy about the matter, he was uncertain whether a tongue stud was prohibited under the policy. He promised to "research it to be sure" but told her in the mean time, "I think it would be prudent if you didn't wear it in full duty." R. at 152, 13:24–25.

Kortrey later discovered the policy prohibited "visible body piercings . . . while on duty (other than post type earrings for females)." R. at 823. On August 12, 2002, he asked Piercy if she was still wearing the tongue stud. She said she was. Kortrey claims that "[w]hile [the dress] policy does not mention 'tongue studs' directly, I determined that it met the standard of a visible body piercing that is not allowed by policy. Commander Presley concurred, and I directed Deputy Piercy accordingly that a 'tongue stud' could not be worn while on duty." *Id.*

Piercy, on the other hand, claimed Kortrey only told her she could not wear a *visible* tongue stud but that he had no problem with a transparent stud. She claims she responded she would "just get a clear piercing and that should solve

the issue," to which Kortrey apparently made no objection. R. at 228. Consequently, Piercy replaced the metallic stud with a clear one.

*Piercy's Employee Grievance.* On September 1, 2002, Piercy submitted an informal employee grievance memo to Undersheriff Teri Goodall,[2] complaining about the August 27 job posting stating female deputies would not be considered for a position at Metro. She also informed Sergeants Kortrey and Caron Allen[3] that she intended to take her complaint outside the department if it was not addressed. On November 7 or 8, she informed Allen and Kortrey that she was filing an EEOC complaint, although she did not actually do so until November 18.

*Second Tongue Stud Incident.* In the meantime, on November 13, 2002, Sergeant Allen saw Piercy wearing a tongue ring and ordered her to remove it. Allen asked Piercy if she had been counseled not to wear a tongue stud, and Piercy denied ever receiving such counsel. Allen recorded in a written statement that Piercy claimed "Sergeant Kortrey had told her that as long as it was small, clear, and not visible, it would be okay." R. at 185. Allen responded that "it was visible, that [she] could see it, and . . . reiterated [the] order not to wear it on duty or in uniform." *Id.* A week later, Lieutenant Dale Goodell and Allen met with

---

[2] The record here refers to Bureau Chief T. L. Johnson. Johnson was later promoted to Undersheriff and changed her last name to Goodall, becoming Undersheriff Teri Goodall for many of the following events. We use her latter name and title for continuity and clarity throughout the opinion.

[3] Allen replaced Kortrey as Piercy's immediate supervisor in late October 2002.

Piercy to discuss the tongue ring incident. She again told them Kortrey had never ordered her not to wear a tongue stud.

At Goodell's request, Kortrey wrote a memorandum which stated he had twice counseled Piercy not to wear a tongue stud, as policy prohibited visible body piercings, and on November 26, 2002, Goodell filed a formal complaint with the Internal Affairs office complaining that Piercy had violated personnel policies and then lied about it. As the investigation progressed, Piercy complained she was being retaliated against because of her employee grievance and singled out for violating operating policies. On December 13, 2002, she submitted a memo requesting a transfer and complaining of retaliation.

*The Internal Affairs Recommendation.* The internal affairs investigation was completed in late January 2003. The disposition recommended that Piercy be terminated for (1) disobeying orders, (2) dishonesty, and (3) dress-code violations. Various prison officials reviewed the findings, and all but one agreed Piercy should be terminated.[4] On February 11, 2003, Undersheriff Teri Goodall terminated Piercy on the basis of the three violations found by internal affairs. [R. at 237.] Piercy appealed the discharge to Sheriff Terry Maketa, stating her belief that "the internal investigation was originally initiated as a result of a miscommunication between [herself] and Sergeant Kortrey" and that she "ha[d]

_____

[4] The dissenting voice recommended suspension and disciplinary probation rather than termination, but sustained the findings against Piercy.

-6-

not yet been able to present [her] side of this case." R. at 239. Nevertheless, Maketa affirmed the decision.

On March 12, 2003, Piercy filed an amended EEOC complaint, adding a retaliation claim. After receiving a right to sue letter for both her discrimination and retaliation claims, she filed a complaint in district court, alleging Sheriff Maketa, EPSO, and the Board of County Commissioners engaged in sex discrimination and retaliation prohibited under Title VII. The complaint also named various defendants associated with EPSO. All defendants moved for summary judgment on the grounds that Piercy had not sustained her burden of proof on either claim. The district court agreed and granted the motion.

This appeal followed.

## II. Analysis

We review the grant of summary judgment de novo. *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1199 (10th Cir. 2006). Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In conducting our analysis, we view all of the facts in the light most favorable to the non-movant and reasonable inferences from the record must be drawn in favor of the non-moving party. *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006).

While we view the record in the light most favorable to the non-moving party, that party must still identify sufficient evidence requiring submission to the jury to survive summary judgment. *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671–72 (10th Cir. 1998). When a party relies on affidavit evidence, it may be insufficient to create a triable fact if it is nonspecific or otherwise non-responsive, vague, conclusory, or self-serving. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004).

With these principles in mind, we turn to Piercy's retaliation and discrimination claims.

## A. Retaliation

Piercy claims EPSO fired her in retaliation for her complaints about the Metro Jail transfer policy.

To establish a prima facie claim for retaliation, an employee must establish (1) he or she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006). Following the well-known *McDonnell Douglas* test, if a prima facie case is established, the employer can rebut it by articulating a "legitimate nondiscriminatory reason" for the adverse action. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). The burden then shifts back to the

employee to show that the proffered reason actually is a pretext masking discriminatory animus. *Id.*

The district court concluded Piercy had not established a prima facie case. The court found Piercy had not established the third prong of a causal connection between her termination in February 2003 and the filing of an employee grievance about the Metro Jail policy in September 2002 or the EEOC complaint in November 2002. On appeal, Piercy claims the internal affairs investigation that led to her dismissal was, itself, evidence of retaliation.

We agree with Piercy that the investigation was evidence to consider in ruling on causation. But because we determine no basis exists for finding the termination was pretextual, we affirm the district court's grant of summary judgment.

### 1. *Prima Facie Case*

The first two elements of a retaliation claim are easily satisfied. Piercy's filing of an EEOC complaint is protected conduct; her dismissal was an adverse employment action.

The last hurdle Piercy must overcome is establishing that her dismissal was causally connected to the filing of the complaint. We have held, "A retaliatory motive may be inferred when an adverse action closely follows protected activity. However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179

(10th Cir. 1999) (emphasis in original) (internal citations omitted); *see also*

*O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

These temporal proximity cases stand for two important points. First, if the only evidence of causation is a temporal relationship, then the adverse action must occur closely following the protected activity. For example, an adverse employment action that happened more than three months after the protected activity was not entitled to a presumption of causation. *Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1183–84 (10th Cir. 2002); *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (noting a three-month separation did not *destroy* any causal connection but simply failed to *establish* by itself such a connection).

Second, the passage of time does not necessarily bar a plaintiff's retaliation claim if *additional* evidence establishes the retaliatory motive. Other evidence in the record could establish an adverse employment action taken after a lengthy period of time was still in response to the earlier, protected activity—temporal remoteness is not necessarily dispositive. While "[w]e have recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive," nonetheless, "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the [protected action] and only culminates later in actual discharge." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

Guided by these authorities, we must consider whether Piercy can make a prima facie showing of retaliation if we treat the internal affairs investigation, which began on November 26, 2002, as additional evidence of retaliation.[5] The possible predicate protected acts would be (1) the September 1, 2002, informal grievance memo about the Metro Jail vacancies; (2) her informal threat in September 2002 to take her complaints "outside the department"; and (3) the November 18, 2002, EEOC complaint.[6]

We need not resolve whether the informal September complaints are too early to support a retaliation claim because the EEOC complaint in mid-November is closely juxtaposed with the beginning of the internal affairs investigation on November 26. The salient facts are as follows:

- November 7 or 8, 2002 - Piercy informed her supervisors that she was filing formal charges.

- November 13, 2002 - Sergeant Allen saw Piercy wearing a tongue stud and ordered her to remove it. Allen also asked Piercy if she had been counseled not to wear a tongue stud, and Piercy denied ever receiving such counsel.

- November 18, 2002 - Piercy filed a complaint with the Colorado EEOC.

---

[5] Piercy does not take the position that the investigation itself was an adverse employment action.

[6] The district court also rejected two minor events that happened in December as protected acts when Piercy complained about retaliation. These complaints can have no causal connection to either the internal affairs investigation or the actual termination because, as the district court concluded (1) they involved persons outside her chain of command, or (2) they involved the already pending internal affairs investigation.

-11-

- November 20, 2002 - Lieutenant Goodell and Sergeant Allen met with Piercy to discuss the tongue stud incident. Piercy referred to her September 1, 2002 grievance memo in that meeting.

- November 26, 2002 - Goodell submitted a complaint regarding Piercy to Internal Affairs.

Viewed in the light most favorable to Piercy, these facts support a theory that (1) Piercy notified her superiors she planned to pursue formal discrimination charges, (2) her supervisors subsequently commenced an investigation based on her violation of personnel policies, which (3) culminated in a recommendation Piercy be fired, and (4) Piercy was fired. Although some of these facts are disputed—especially the question of the motive behind the investigation—if true, they link her protected conduct with an adverse employment action in a temporally sufficient manner. Piercy has therefore satisfied the causation element of a prima facie case for purposes of summary judgment.

We must therefore examine the remaining *McDonnell Douglas* factors to determine if summary judgment was appropriate.

### 2. Legitimate, Nondiscriminatory Reason

In response to Piercy's prima facie showing, defendants are entitled to offer a "legitimate, nondiscriminatory reason for the adverse employment action." *O'Neal*, 237 F.3d at 1252. Defendants claim Piercy was fired for three reasons: (1) failure to obey orders, (2) "departure from the truth," and (3) a uniform violation (wearing a tongue ring).

Piercy argues these reasons were not legitimate grounds for firing her because EPSO did not typically fire employees for violating these rules. She

submits a chart showing several employees who were not fired, despite having several violations, including departure from the truth. The record also suggests dress code violations often went undisciplined, even unnoticed, i.e. no discipline for jewelry violation, no discipline for uniform violations, another employee's tongue stud. Defendants concede the uniform violation alone would not have been enough to terminate Piercy. But defendants argue the three violations together justify Piercy's dismissal. Piercy's chart does not undercut defendants' claim that the three violations taken together were legitimate grounds for firing her. In every 2002 case cited by Piercy's chart in which departure from the truth was alleged and sustained, the employee was terminated. If anything, Piercy's chart shows a firm pattern of discipline against employees who do not tell the truth. While the chart shows only superficial details about other disciplinary cases, it plainly establishes that the three proffered reasons, when sustained, were adequate grounds for firing Piercy.

We therefore must move to the final factor necessary to avoid summary judgment: Is there evidence that the termination was pretextual?

### 3. Pretext

Because defendants can show legitimate reasons for Piercy's dismissal, the burden shifts back to Piercy to demonstrate why the stated reasons are pretextual. *See O'Neal*, 237 F.3d at 1252. "[S]ummary judgment is appropriate where a plaintiff cannot meet the burden of proving that an employer's articulated nondiscriminatory reason for an alleged retaliatory action is pretextual." *Miller v.*

*Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1123 (10th Cir. 2005). In establishing pretext, an employee can show "the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Id.* (internal quotations omitted).

"[A] challenge of pretext," however, "requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee." *Green v. New Mexico*, 420 F.3d 1189, 1191 n.2 (10th Cir. 2005); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1231 (10th Cir. 2000). In this case, the relevant eyes through which to view the termination decision are those of Undersheriff Goodall and Sheriff Maketa. "The relevant inquiry is not whether [their] proffered reasons were wise, fair or correct," but rather we ask whether they believed those reasons to be true and "acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)). Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision. *EEOC v. Flasher Co.*, 986 F.2d 1312, 1322 n.12 (10th Cir. 1992). Accordingly, "[their good faith] perception of the employee's performance . . . is relevant, not plaintiff's subjective evaluation of [her] own relative performance." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999) (internal quotations omitted).

We have recently elaborated on the "quantum of evidence" that must be shown for a trier of fact in a discrimination claim to reasonably infer that an

employer is acting in bad faith to cover up a discriminatory purpose. *Young*, 468 F.3d at 1250. The fact finder must be able to conclude "discrimination was a determinative factor in the employer's actions—simply disbelieving the employer is insufficient." *Id.* Our standard for a retaliation claim, then, leads to our central question: Did Piercy offer any evidence that the decisionmakers who terminated her—Undersheriff Goodall and Sheriff Maketa—did not honestly believe Piercy committed the three violations or terminated Piercy for retaliatory reasons? We conclude she did not.

Piercy mainly argues conflicting evidence exists about what she was told regarding wearing a tongue ring, so summary judgment was improper. But conflicting evidence only affects summary judgment if it is relevant to the inquiry. While both sides present a different explanation of the communications between Kortrey and Piercy regarding her tongue ring, in the end, Piercy has not shown any reason to believe Maketa or Goodall dismissed her to mask retaliatory motives.

First of all, the decision to recommend dismissal of Piercy was made on February 11, 2003, by Undersheriff Goodall only after completion of the internal affairs investigation. Goodall testified she made the decision based on all of the evidence presented to her, including Piercy's version of the events surrounding the tongue stud. Piercy was then given the opportunity to appeal Goodall's recommendation to Sheriff Maketa, who sustained the dismissal. The evidence before them included, among other things, (1) Kortrey's contemporaneous

memorandum in August summarizing his conversation with Piercy; (2) undisputed evidence that Piercy was admonished against wearing a *visible* tongue ring; (3) suggestions that Piercy shaded the truth about her conversation with Kortrey when she was admonished a second time about her tongue ring in November; and (4) a history of insubordination by Piercy that pre-dated the tongue ring incidents.[7] Thus, nothing suggests the proffered reasons for termination are weak, implausible, or inconsistent. *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

Second, even if Piercy and Kortrey simply misunderstood each other when Kortrey discussed the policy with her, nothing suggests the Undersheriff acted in bad faith in ordering the termination of Piercy or that the Sheriff acted in bad faith in sustaining the dismissal based on the evidence before them.[8] As discussed above, the previous Sheriff sustained every termination involving departure from the truth in 2002,[9] and Piercy has not pointed to material disputed facts that Goodall or Maketa treated her differently from other employees subject

---

[7] Piercy claims an internal EPSO memo referencing "problem people" further supports her contentions. Given the lack of context—date, authorship, origins, intent—the vague references do not provide evidence of retaliation. *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994) ("the plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her.").

[8] Piercy speculates Goodall could be retaliating in bad faith for Piercy's filing of complaints, but she offers no evidence beyond conjecture and conclusory statements.

[9] In 2002, Maketa was the undersheriff. He became sheriff in January of 2003.

to discipline.  If the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, we cannot conclude they were a subterfuge for discrimination or, likewise, retaliation. *Rivera*, 365 F.3d at 924–25.[10]

In her response to defendants' motion for summary judgment below, Piercy relied primarily on two pieces of evidence, (1) a chart of disciplinary actions regarding other officers, (2) as well as specific discussion of certain disciplinary cases to demonstrate pretext by indicating she was treated differently than other officers in her termination.[11]  It has been held that evidence of less severe discipline for other employees that are not members of the same protected group who violated work rules of comparable seriousness can establish pretext. *See McDonnell Douglas*, 411 U.S. at 804.  But such evidence usually requires a consistent chain of command for relevance, however, since different supervisors may simply discipline employees with differing severity across the board.

---

[10]  Our decision in *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476 (10th Cir. 2006), discusses a theory where evidence that the terminating officers' decisions were manipulated by subordinates with discriminatory or retaliatory motives could lead to a finding of pretext.  Such a theory was not raised by the plaintiff in this case, so we need not analyze the possibility.  Piercy, in any event, charges Goodall and Maketa with intentionally retaliating against her.

[11]  Piercy also contends the failure to use polygraphs, which "are used in [Internal Affairs] investigations at the discretion of the supervisors at EPSO" demonstrates that EPSO acted contrary to company practice when taking action against her and this is evidence of pretext.  R. at 327.  But Piercy's own words betray her contention.  She admits polygraph use is discretionary, thus deciding against the employment of polygraphs here cannot be contrary to company practice.  And Piercy submitted evidence that polygraphs were not uniformly employed in Internal Affairs investigations.

Piercy admitted that none of the individuals in her alleged examples shared the same chain of command. She argued to the district court, however, that we previously held different supervisors do not preclude consideration of differential treatment evidence in determining pretext and cited to *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1177–78 (10th Cir. 2001) and *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1198 n.10 (10th Cir. 2000). In both of those cases, we determined the same supervisor test was irrelevant when considering allegations of a company-wide discriminatory policy. But there were no allegations of a company-wide policy of retaliation in this case. Accordingly, the same supervisor test applies, undermining Piercy's claim of disparate treatment. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Piercy has failed to bring forward evidence to show that retaliatory motive was a determinative factor in her dismissal. Accordingly, she has not sustained her burden under *McDonnell Douglas* to establish fact issues for trial.

## B. Sex Discrimination

In addition to her retaliation claim, Piercy claims EPSO discriminated against her prior to her termination through various sex-based policies that led to adverse employment actions in the form of: (1) less desirable assignments at CFC, and (2) a barrier to transferring to Metro Jail. The district court granted summary judgment on this claim because it concluded Piercy had not established an adverse employment action under the *McDonnell Douglas* burden-shifting test. We agree

on its assessment of the first policy, but find the district court erred when examining the question of transfer to Metro.

The parties and the district court applied the *McDonnell Douglas* framework to the sex discrimination claim. On Piercy's first allegation of discrimination, we agree that *McDonnell Douglas* is appropriate.

### 1. Shift-Bidding Policy

To make her prima facie *McDonnell Douglas* case for sex discrimination, Piercy must establish (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998). The district court found Piercy could not establish an adverse employment action because EPSO's shift-bidding process created a "mere inconvenience" that did not rise to the level of an adverse action.

The Supreme Court most recently addressed the contours of adverse employment actions in *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006). The Court made clear the substantive discrimination provisions of Title VII are limited "to [adverse] actions that affect employment or alter the conditions of the workplace." 126 S. Ct. at 2412. Thus, while *Burlington Northern* modified our retaliation standards for adverse actions, it had no similar

effect on our discrimination jurisprudence.[12]  Accordingly, we continue to

examine claims of adverse action on the basis of race or sex discrimination on a

case-by-case basis, "examining the unique factors relevant to the situation at

hand."  *Sanchez*, 164 F.3d at 532.

Adverse employment action includes "significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits."

*Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004).  But we still will

not consider "a mere inconvenience or an alteration of job responsibilities to be

an adverse employment action."  *Sanchez*, 164 F.3d at 532 (internal quotations

omitted).

In *Sanchez*, we held that a female teacher denied transfer to a position with

"the same salary and benefits . . . [and] substantially similar duties" did not suffer

an adverse employment action because the position was "a purely lateral

transfer."  *Id.*  "If a transfer is truly lateral and involves no significant changes in

an employee's conditions of employment, the fact that the employee views the

---

[12]  *Burlington Northern* applied a more lenient standard in analyzing the anti-retaliation provisions of Title VII.  A challenged action may be adverse in a retaliation case if "a reasonable employee would have found [it] materially adverse."  *McGowan*, 472 F.3d at 742 (quoting *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006)); *Argo*, 452 F.3d at 1202 n.2.  The relevant inquiry is whether the employer's action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 126 S. Ct. at 2415 (internal quotations omitted).

transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Id.* at 532 n.6.

Piercy's allegation of discrimination in shift-bidding fails for the same reasons as the claims in *Sanchez*. Most of Piercy's arguments go to the desirability of certain shifts at CJC. But all of the shifts had similar duties and responsibilities, and, on this record, cannot be seen as *substantially* different than one another. Piercy, moreover, was eligible for different shifts, it was only the frequency with which she succeeded in her bids that was at issue. In this context, the district court properly found EPSO's shift-bidding policies that required certain numbers of female and male guards to be available at CJC were a "mere inconvenience" and did not constitute an adverse employment action. We agree with the district court's assessment.[13]

## 2. Metro Jail Transfer Policy

The parties and the district court also applied *McDonnell Douglas* in analyzing the job posting at Metro where "only requests from male deputies will be accepted." R. at 89. In applying *McDonnell Douglas*, the district court found the Metro job constituted no more than a lateral transfer and based on *Sanchez* determined no adverse employment action had occurred. We disagree.

The prima facie case from *McDonnell Douglas* helps establish "an inference of discrimination" and "eliminates the most common nondiscriminatory

_____

[13] We also agree with the district court that the additional duties of patting down the female inmates at CJC (which the male guards did not have to do) does not rise to the level of an adverse employment action.

-21-

reasons for the plaintiff's rejection." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). But where an employer's policy is discriminatory on its face, we need not worry about eliminating nondiscriminatory reasons for an employer's action. In cases of facial discrimination, "There is no need to probe for a potentially discriminatory motive circumstantially, or to apply the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 n.16 (10th Cir. 1995); *see also Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 131–132 (3d Cir. 1996); *Reidt v. County of Trempealeau*, 975 F.2d 1336, 1340–41 (7th Cir. 1992). Once facial discrimination has been established in the record, we review only to see (1) if the affected person is a member of the discriminated class for purposes of standing; (2) whether the policy affects rights protected by the statute; and (3) whether any affirmative defenses exist to the discrimination.

In her motion for summary judgment below, Piercy asserted the policy preventing women from taking jobs at Metro discriminated on its face and thus only a bona fide occupational qualification per 42 U.S.C. § 2000e-2(e) could justify such facial discrimination. Given the job posting's clear language that women need not apply, the facial discrimination is equally clear. As the job posting's language is plainly discriminatory on its face and Piercy is clearly an affected member of the class, we turn to whether the discriminatory policy affected protected rights.

Section 703(a) of the Civil Rights Act of 1964, as amended, makes it illegal for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). "[E]mployment decisions that adversely affect an employee's status" are covered by the statute. *Int'l Union v. Johnson Controls, Inc.,* 499 U.S. 187, 197 (1991). And as we noted earlier, this approach requires us to consider "the unique factors relevant to the situation at hand." *Sanchez*, 164 F.3d at 532.

Even if we were to analogize this case to *Sanchez* and its language regarding lateral transfers as the district court did, we are not convinced the case before us constitutes a truly "lateral transfer" where the job duties were substantially the same such that no adverse employment action occurred. Piercy claims EPSO's policy preventing *any* female from transferring to Metro materially discriminated against her and the other women deputies, and that, as a consequence, they were ineligible for work in Metro. Piercy points to evidence in the record (1) that work in Metro would be less arduous and stressful than CJC due to the indirect nature of supervision, and (2) that the opportunity to work Metro shifts increased her chances of obtaining additional job and leave flexibility. We think the differences in duties between the two prisons are sufficiently substantial to preclude the district court's finding that a transfer to Metro from CJC would be purely lateral.

Summary judgment was improperly granted on whether Piercy's inability to transfer to Metro Jail was an adverse employment action.

### 3. Bona Fide Occupational Qualification

EPSO suggests two reasons for the policy that restricted Piercy from bidding for a shift at Metro: (1) at the time, there were not enough female guards available to staff the female ward at CJC; and (2) privacy and safety considerations required sufficient female staff at CJC. While these reasons may be adequate to support EPSO's policy as a bona fide occupational qualification that permits discrimination under 42 U.S.C. § 2000e-2(e), the district court did not reach this question. We remand for it to do so.

## III. Conclusion

For these reasons, we AFFIRM the district court in part and REVERSE in part, remanding for further proceedings with respect to the Metro Jail transfer policy.