**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 4, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EMETRIA WHEELER,

     Plaintiff-Appellant,

v.

BNSF RAILWAY COMPANY; MIKE
D. HARDING,

     Defendants-Appellees.

No. 10-3155

(D.C. No. 2:09-CV-02270-KHV)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **EBEL** and **TYMKOVICH**, Circuit Judges.

---

Plaintiff Emetria Wheeler appeals from the district court's order granting

defendants BNSF Railway Company's (BNSF's) and Mike Harding's joint motion

for summary judgment on Wheeler's claims of gender discrimination, race

discrimination, and retaliation under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981. Exercising jurisdiction

pursuant to 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

I

*Wheeler's employment with BNSF and her transfer to Lincoln*

Wheeler, an African-American woman, began her employment with BNSF's predecessor, the Santa Fe (SF) railroad, in April 1977. After completing an apprenticeship, she became a freight car painter at SF's Topeka facility and a member of the Brotherhood Railway Carmen Division of the Transportation Communications International Union (BRC).

As a member of the BRC, Wheeler was placed on the freight painter roster for the Topeka Seniority District. That roster was used by SF and BRC for determining seniority among BRC members. In 1988, an agreement between BRC and SF "closed the Freight Painter Roster in Topeka, providing that no additional employees would thereafter establish seniority" on that roster. Aplt. App. at 65.

On March 8, 2002, BNSF (having taken over SF) and BRC entered into a memorandum of agreement (the March 2002 Transfer Agreement) in anticipation of BNSF's transfer of all its freight car work from its Topeka facility to its Havelock facility in Lincoln, Nebraska. As part of this transfer of work, which occurred in April 2002, only five active painters were retained on the Topeka freight painter roster. The remaining painters on the Topeka freight painter roster, including Wheeler, were given the option of either accepting a transfer to Lincoln or accepting a furlough in Topeka until work became available. Wheeler

2

elected to transfer to Lincoln.

Pursuant to the terms of the March 2002 Transfer Agreement, all painters who transferred to Lincoln had their seniority dates "dovetailed to the Lincoln Seniority District and were removed from the Topeka Seniority District." Id. at 24. Further, under the terms of Side Letter No. 5 to the March 2002 Transfer Agreement, "a Freight Painter Roster was created in the Lincoln Seniority District and the freight painters transferring from Topeka were granted Freight Carman Seniority in [Lincoln] effective in April 2002." Id. Thus, Wheeler knowingly gave up her seniority in Topeka, but "was afforded seniority on both the Journeyman Carman and Freight Painter Rosters in [Lincoln]." Id. Along with Wheeler, BNSF employees John Rangel and Rick Barnes were afforded journeyman car status as a result of the move from Topeka to Lincoln.

By transferring from Topeka to Lincoln, Wheeler also became subject to a collective bargaining agreement (CBA) between BRC and the former Burlington Northern (BN) railroad, whereas in Topeka her work had been the subject of a CBA between BRC and SF. According to Wheeler, safety issues were treated the same under both CBAs, but otherwise the two CBAs "were totally different." Id. at 97. Wheeler explained:

> They did things at [Lincoln] that we would never be allowed to do in Topeka. They ran things at [Lincoln] totally different from what we did in Topeka. [Lincoln] to my personal opinion to me it was like a step back in time at least 20 years. The same booth that I ran in [Lincoln] we got rid of in Topeka 20 years ago. So it was like a step

3

back in time.  To all of us that went there was like a big step back in time.

Id.[1]

*Transfers from Lincoln to Topeka prior to April 2005*

"From the time of the transfer of the freight car work to [Lincoln] in 2002 until April 2005, the CBAs . . . did not govern the means by which employees who transferred from Topeka to [Lincoln] might return to Topeka." Id. at 25. Instead, during that time period, open positions in Topeka were filled by first posting notice of the opening, accepting applications, interviewing selected applicants, and filling the position with the best qualified applicant.  Under this procedure, employees at BNSF's Lincoln facility, such as Wheeler, were treated the same as all other applicants, including non-BNSF employees.

In January 2005, a position for a passenger painter at BNSF's Topeka facility was "bulletined," i.e., announced to BRC members. Id. at 60.  The position was ultimately awarded by Harding, who was then the general foreman overseeing business cars, to Rangel, the most senior person on Lincoln's Passenger Painter Seniority roster.  Although Rangel subsequently retired in July 2005, the position he vacated was not immediately filled due to Harding's concern that there was a lack of sufficient painting work.

---

[1] Although Wheeler now asserts that this description was intended to mean that she viewed things in Lincoln in a negative light, the record contains no additional explanation from Wheeler or any other witnesses describing the differences between the two locations.

4

*The April 2005 Agreement*

"In April 2005, an Agreement was executed between BNSF and BRC which provide[d] for the transfer of BNSF employees from one location to another location covered by any of the . . . separate CBAs between the BRC and the predecessor companies that merged into the present BNSF." Id. at 25.  More specifically, "[t]he April 2005 Agreement permitted a voluntary transfer between locations governed by the separate CBAs to fill [vacant] positions . . . for which there [we]re no employees with seniority at that location or district available for assignment or recall." Id.  "Assignments to such vacant positions [we]re, pursuant to the [April 2005] Agreement, made in the following order:

> (a) Senior furloughed employees covered by the same CBA holding seniority at another location;
>
> (b) Senior active employees covered by the same CBA holding seniority at another location;
>
> (c) Senior furloughed employees covered by a different CBA; and
>
> (d) Senior active employees covered by a different CBA."

Id.  "Thus," for example, "a vacant position at a SF location would first be assigned, in order, to a furloughed employee at another SF location, then to an active employee at another SF location, then to a furloughed employee from a BN location, and then to an active employee at a BN location." Id. at 26.

*Transfers to Topeka pursuant to the April 2005 Agreement*

On or about May 9, 2005, William Galloway, a journeyman carman who

5

was transferred from Topeka to Lincoln in 2002, transferred from Lincoln to BNSF's Kansas City facility to work as a carman. Because the Kansas City facility was a former SF facility, the April 2005 Agreement thus afforded Galloway, following his transfer to Kansas City, preference for any open position in the Topeka facility over anyone in Lincoln who might have desired a transfer to Topeka.

On June 10, 2005, Wheeler submitted to BNSF a form entitled "Carman Request to Transfer Between Separate Agreements," indicating her desire to transfer to BNSF's Topeka facility. Id. at 94. According to Wheeler, she considered Topeka her home, and "[a]ny point closer to home than Lincoln, Nebraska [she] would have transferred." Id. at 148.

In November 2006, Wheeler was offered a position as a laborer at the Topeka facility. Wheeler declined the position. According to Wheeler, she was unsure if she could handle the position and was not assured by anyone at BNSF that she could return to her position in Lincoln if necessary.

Barnes, a former Topeka employee who transferred to Lincoln in 2002, submitted a transfer request on June 21, 2005, listing both Topeka and Kansas City as preferred transfer locations. In early 2007, Barnes was offered a transfer to BNSF's Kansas City facility to work as a carman. Barnes rejected the offer because he was interested only in transferring to a painter position.

On or about April 16, 2007, Galloway transferred from BNSF's Kansas

6

City facility to its Topeka facility. In Topeka, Galloway was placed on the apprentice carman roster and the journeyman carman roster.

*Wheeler's transfer to, and subsequent work at, the Topeka facility*

On May 22, 2008, BRC and BNSF entered into a memorandum of agreement (the May 2008 Agreement) authorizing the opening of two freight painter carman positions at the Topeka facility. The May 2008 Agreement further provided that the successful applicants for those two positions would be added to Topeka's "Closed Freight Painter Roster," thereby establishing seniority for the successful applicants as of the date they were placed on the roster. Aplee. App. at 241.

As a result of the May 2008 Agreement, Barnes, and subsequently Wheeler, were returned to the Topeka facility as painters. Wheeler was placed on the Topeka roster, and in turn its closed freight painter roster, in August 2008. Wheeler's position in Topeka was as a locomotive painter. Wheeler's rate of pay at the Topeka facility was equivalent to her rate of pay at the Lincoln facility.

According to Wheeler, after returning to work at the Topeka facility, she was treated less favorably than Barnes. Specifically, Wheeler alleges that, "in contrast to . . . Barnes, [she] was not given keys to the facility or keys to her personal locker, nor was she assigned a vehicle to use." Id. at 119. However, Wheeler ultimately protested and was given keys to the facility and keys to a shared vehicle.

7

Wheeler further alleges she was treated unfavorably because she "was not given her work assignments directly from her supervisor; instead, her work assignments were relayed to her through . . . Barnes." Id. at 119-20. Wheeler also alleges that she "has been given work assignments — such as painting battery boxes, or pan engines, or inside a cab — with unusually short time requirements." Id. at 120. More specifically, for example, Wheeler alleged that she "would be assigned [to paint] battery boxes, an engine and also inside a cab in one shift where[as] everyone else has two or three shifts to do said locomotives." Id. at 142. Wheeler has never been disciplined or reprimanded for failing to meet performance expectations.

*Wheeler's charges of discrimination*

On June 15, 2007, while still stationed in Lincoln, Wheeler filed a charge of race and gender discrimination with the Topeka Human Relations Commission. BNSF responded to that charge and denied Wheeler's allegations.

On December 29, 2007, again while still stationed in Lincoln, Wheeler filed a charge of discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission (EEOC). In that charge, Wheeler alleged, in pertinent part, that since April 2002, "positions in Topeka for which [she] h[e]ld seniority on ha[d] been given to Mexican American [and] white male employees," and she "believe[d] that [she was] being discriminated against . . . because of [her] race . . . and sex . . . ." Id. at 95. On the portion of the form

8

indicating the "DATE(S) DISCRIMINATION TOOK PLACE," Wheeler listed an "Earliest" date of "04-02-07," and a "Latest" date of "04-02-07." Id. However, Wheeler also checked the box indicating "CONTINUING ACTION." Id. Wheeler did not allege any retaliatory conduct on the part of BNSF in her December 2007 charge.

On June 30, 2008, Wheeler filed a charge of discrimination with the Nebraska Equal Opportunity Commission. In that charge, Wheeler indicated that she had been denied a transfer back to Topeka "due to [her] race, color and sex." Aplee. App. at 215. Wheeler further alleged her belief that she was never asked to return to Topeka "in retaliation for [her] complaints about the discriminatory way Harding [wa]s choosing people to go back to Topeka." Id. Wheeler indicated that the "EARLIEST" date of discrimination was "9/1/07," and the "LATEST" date of discrimination was "6/16/08." Id.

On or about February 25, 2009, the EEOC issued a Dismissal and Notice of Rights as to the December 29, 2007 charge of discrimination. Shortly thereafter, on or about March 2, 2009, the EEOC issued a Dismissal and Notice of Rights as to the June 30, 2008 charge of discrimination.

*Case history*

Wheeler filed the instant action on May 21, 2009. Wheeler's complaint named BNSF and Harding as defendants. Count I of Wheeler's complaint alleged disparate treatment on account of "her gender and/or race . . . ." Aplt. App. at 10.

9

According to Wheeler, the disparate treatment "included . . . refusing to transfer [her] back to the Topeka facility, assigning her unfavorable work duties, and restricting her opportunity to work overtime." Id. Count II of Wheeler's complaint alleged that, because of "her gender and/or her race," she was subjected to a hostile work environment "by her co-workers and her supervisors, including Mr. Harding."[2] Id. at 11. Count III of Wheeler's complaint alleged that "[b]ecause of her complaints of discrimination and harassment, [she] was subjected to adverse employment actions, including refusing to transfer her back to the Topeka facility, assigning her unfavorable work duties, and restricting her opportunity to work overtime." Id. at 12. Each of Wheeler's claims were based upon Title VII and § 1981.

On August 24, 2009, BNSF and Harding filed a motion to dismiss Wheeler's complaint. On March 2, 2010, the district court issued a memorandum and order granting in part and denying in part defendants' motion to dismiss. More specifically, the district court dismissed Wheeler's Title VII claims against Harding, any Title VII claims against BNSF that were based on conduct that occurred before March 4, 2007 and after June 30, 2008 (i.e., outside the time periods covered by Wheeler's two EEOC charges), and any § 1981 claims that were based on conduct that occurred before May 21, 2005 (more than four years

---

[2] According to the record, "the harassment claims set forth in count II of plaintiff's complaint . . . were abandoned during the pretrial conference." Aplee. App. at 72.

10

prior to the filing of Wheeler's complaint in federal district court). Wheeler does not appeal the dismissal of those claims.

The district court's ruling on defendants' motion to dismiss left in place five distinct claims of race/gender discrimination under Title VII and § 1981:

> (1) BNSF's failure to transfer Wheeler to Topeka after Rangel retired in July 2005;

> (2) BNSF's failure to transfer Wheeler to Kansas City in the fall of 2006;

> (3) BNSF's failure to transfer Wheeler to Topeka in April of 2007;

> (4) BNSF's failure to transfer Wheeler to Topeka after June 2007; and

> (5) Harding's purported unfavorable treatment of Wheeler after she returned to Topeka in 2008.

The district court's ruling also left in place Wheeler's claim that she was retaliated against by defendants (by failing to transfer her to Topeka after June 2007 and by treating her unfavorably after she returned to Topeka) for complaining about alleged race and gender discrimination.

On February 17, 2010, defendants moved for summary judgment with respect to all of Wheeler's claims. Defendants argued, in pertinent part, that Wheeler could not "demonstrate a prima facie case of discrimination, . . . disparate treatment[, or retaliation] based on race and/or gender under Title VII or § 1981," and that, in any event, "the complained of actions [we]re the result of legitimate, non-discriminatory reason[s] and there [wa]s no evidence of pretext."

11

Id. at 53.

On June 4, 2010, the district court issued a memorandum and order granting defendants' motion for summary judgment. In disposing of Wheeler's four "failure to transfer" discrimination claims, the district court concluded that "[t]he record contain[ed] no evidence of an objective difference between [Wheeler]'s position in [Lincoln] and [any of the positions] which she sought in Topeka," and thus, as a matter of law, "BNSF's refusal to transfer [her] to Topeka . . . did not constitute adverse employment action . . . ." Id. at 217. As for Wheeler's unfavorable treatment claims of discrimination, the district court concluded that (a) Wheeler failed to "allege how defendants' failure to provide [her with] keys was a materially adverse employment action," id. at 219, (b) Wheeler "d[id] not specify her need for [her own] vehicle or why defendants' failure to provide her a vehicle could be construed as an adverse employment action," id., (c) "telling one employee to take occasional orders from another employee [wa]s not adverse employment action, especially absent evidence that the employer disciplined plaintiff for failing to comply with orders," id. at 220, and (d) "[p]ressure to perform an essential function of one's job [wa]s not adverse employment action." Id. Lastly, with respect to Wheeler's retaliation claims, the district court concluded that neither defendants' failure to transfer Wheeler, nor their purported disparate treatment of her after she returned to Topeka, constituted an adverse employment action.

12

After the district court entered judgment, Wheeler filed a timely notice of appeal.

II

On appeal, Wheeler challenges the district court's grant of summary judgment in favor of BNSF on her Title VII and § 1981 discrimination and retaliation claims, contending "the district court erroneously weighed the evidence, and failed to view the record in the light most favorable to [her]." Aplt. Br. at 18. More specifically, Wheeler contends that "a reasonable jury, when faced with the evidence presented here, could return a verdict for [her] on her claim[s] of discrimination as well as on her claim[s] of retaliation." Id.

*Standard of review for summary judgment rulings*

"We review a district court's grant of summary judgment de novo, applying the same legal standard used by the lower court." Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1277 (10th Cir. 2010). "Summary judgment is proper only if 'there is no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)). "In conducting our analysis, we view all of the facts in the light most favorable to the non-movant and draw all reasonable inferences from the record in favor of the non-moving party." Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006).

*Wheeler's Title VII and § 1981 discrimination claims*

Wheeler, relying on a "mixed-motive" theory, see Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989), superseded by statute on other grounds, Civil Rights Act of 1991, Pub.L.No. 102-166, § 107(a), 105 Stat. 1074, claims she was subjected by defendants to race and gender discrimination in violation of Title VII and § 1981. To prevail on those claims, Wheeler must establish, in pertinent part, that she was subjected by defendants to "an adverse employment decision." Id.

We "examine claims of adverse action on the basis of race or sex discrimination on a case-by-case basis, examining the unique factors relevant to the situation at hand." Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007) (internal quotation marks omitted). "Adverse employment action includes 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Hillig v. Rumsfield, 381 F.3d 1028, 1032-33 (10th Cir. 2004)). "'[A] mere inconvenience or an alteration of job responsibilities'" does not qualify as "'an adverse employment action.'" Id. (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)).

*a) Defendants' failure to transfer Wheeler*

The bulk of Wheeler's discrimination claims hinge on her assertion that she was subjected to an adverse employment action each time defendants failed to

14

transfer her from Lincoln to Topeka. We agree with the district court, however, that these failures to transfer did not qualify as adverse employment actions.

In Sanchez, we "held that a female teacher denied transfer to a position with 'the same salary and benefits . . . [and] substantially similar duties' did not suffer an adverse employment action because the position was 'a purely lateral transfer.'" Id. (quoting Sanchez, 164 F.3d at 132). In so holding, we emphasized that "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." Sanchez, 164 F.3d at 532 n.6.

Wheeler's case is indistinguishable in this regard from Sanchez. The evidence in the record, even viewed in the light most favorable to Wheeler, establishes that the painter positions Wheeler sought in Topeka offered the same salary and benefits and involved duties which were substantially similar to Wheeler's position in Lincoln. In short, each of the painter positions in Topeka that Wheeler claims she was denied were, as was the case in Sanchez, "purely lateral transfers." Moreover, it is apparent from the record, even when viewed in the light most favorable to Wheeler, that she, like many of the other BNSF employees transferred from Topeka to Lincoln in 2002, subjectively desired to be moved back to Topeka for personal reasons. See Williams v. R.H. Donnelley

15

Inc., 368 F.3d 123, 128 (2d Cir. 2004) (concluding that employer's denial of plaintiff's transfer request was not adverse because plaintiff established only that the denial resulted in her "subjective, personal disappointment").  In other words, the evidence in the record fails to establish any objective differences that would have rendered the positions in Topeka more desirable or otherwise materially different.  See, e.g., Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 275 (7th Cir. 2004) (concluding that, "because [plaintiff's] request was for a lateral transfer offering parallel pay, benefits, and responsibilities, UPS's refusal to grant that request does not constitute an adverse employment action"); LePique v. Hove, 217 F.3d 1012, 1013 (8th Cir. 2000) (holding "that a decision to transfer an employee to another city, a transfer that the employee did not want, is not an adverse employment action of sufficient consequence to justify an action under Title VII, assuming, as is the case here, that the job to which the employee is being transferred is of equal pay and rank and with no material change in working conditions"); Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879 (5th Cir. 1999) (rejecting plaintiff's assertion that purely lateral transfer constituted an adverse employment action, and further concluding that simply because plaintiff wanted the transfer to shorten his commute could not "have any effect on whether [it] view[ed] the transfer as a purely lateral one").

In her appellate briefs, Wheeler cites to what she refers to as "two 'unique factors'" in this case that establish that BNSF's refusal to transfer her from

16

Lincoln to Topeka constituted an adverse employment action. Aplt. Reply Br. at 2. "The first unique factor," Wheeler contends, "is that from October of 2002 through June of 2008, nineteen employees chose to transfer from Lincoln to Topeka." Id. She argues that "[a] reasonable jury could infer from the choice made by nineteen employees that a position in the Topeka facility was objectively more desirable than a position in the Lincoln facility." Id. "The second unique factor," she asserts, "consists of [her] testimony that she and the other employees who transferred from Topeka considered the Lincoln facility to be 'a big step back in time,' in comparison to the Topeka facility." Id. (quoting Aplt. App. at 97). She argues that "[a] reasonable jury could infer from this testimony that the Topeka facility was more modern than the Lincoln facility, and therefore the working conditions in the Topeka facility were more favorable than those in the Lincoln facility." Id. at 2-3.

Wheeler failed, however, to assert these arguments below. Even though defendants argued in their motion for summary judgment that Wheeler could not establish that she was subjected to any adverse employment actions, see Aplt. App. at 77-79, Wheeler's brief in opposition was silent on that issue. More specifically, Wheeler made no mention in the statement of facts section of her opposition brief of (a) the number of employees who transferred from Lincoln to Topeka during the relevant time period or (b) her own subjective belief that the Lincoln facility was somehow less favorable than the Topeka facility. In turn, the

17

argument section of Wheeler's opposition brief contained no discussion of adverse employment action, let alone a detailed discussion of how the failures to transfer her constituted adverse employment action. Thus, because Wheeler's arguments are being raised for the first time on appeal, we need not consider them.[3]  See Doe v. Shurtleff, 628 F.3d 1217, 1226 (10th Cir. 2010) ("Generally, we do not consider issues not presented to, considered and decided by the trial court, because an appellant's new argument gives rise to a host of new issues, and Appellee had no opportunity to present evidence it may have thought relevant on these issues." (internal quotation marks omitted)).

Finally, Wheeler suggests that her case is distinguishable from Sanchez because she "is asserting a mixed-motive theory of recovery," and, "[a]s codified in [Title VII,] 42 U.S.C. § 2000e-2(m), such a theory of recovery applies to 'any

---

[3] Even if we were to address Wheeler's arguments, there appears to be no merit to them.  With respect to Wheeler's assertion that nineteen employees transferred from Lincoln to Topeka, the portions of the record she cites to in her appellate reply brief are ambiguous at best, and the precise number of employees who transferred from Lincoln to Topeka is unclear.  See Aplt. App. at 93, 99, 100, 207.  And, even assuming that nineteen employees did transfer from Lincoln to Topeka between October 2002 and June of 2008, the record contains no explanation of the reasons for those transfers.  At best, it appears that most, if not all, of these employees worked in Topeka prior to 2002, were transferred to the Lincoln facility in 2002, and subjectively desired to return to the Topeka facility. See id.  As for Wheeler's assertion that the Lincoln facility was a "big step back in time" from the Topeka facility, a review of the deposition transcript in which she made that statement reveals that Wheeler provided no explanation for that assertion.  Moreover, although she now asserts that her opinion was shared by other employees at the Lincoln facility, there is no record support for that assertion.

18

employment practice,'" and "is not limited to employment practices which are objectively adverse."[4] Aplt. Br. at 22 (emphasis in original). Again, however, Wheeler did not assert this argument below, and thus we need not consider it. And, in any event, Wheeler fails to cite a single case in support of this assertion, and our independent research reveals that federal case law is contrary to Wheeler's assertion. E.g., White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) ("[I]n order to present a claim, either mixed-motive or single-motive, under Title VII, a plaintiff must demonstrate that he has suffered an 'adverse employment action.'"); Gudenkauf v. Stauffer Comm'ns, Inc., 158 F.3d 1074, 1084 (10th Cir. 1998) ("We are persuaded that Congress did not intend to place mixed-motive plaintiffs in a more favorable position than plaintiffs for whom discrimination is the sole cause of an adverse employment decision." (internal quotation marks omitted)).

In sum, we conclude the district court properly held that defendants' failure to transfer Wheeler from Lincoln to Topeka on various occasions did not constitute an adverse employment action under Title VII or § 1981.

---

[4] The statute cited by Wheeler provides, in its entirety:
Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.
42 U.S.C. § 2000e-2(m).

*b) Defendants' treatment of Wheeler after her return to Topeka*

Wheeler also contends that, after she was finally transferred from Lincoln back to the Topeka facility, defendants subjected her to adverse employment action by treating her less favorably than Barnes.[5] This purported unfavorable treatment consisted of (1) not being given her own vehicle to use at the Topeka facility, (2) not being given keys to the Topeka facility, (3) being given work assignments with unusually short time requirements, and (4) having her work assignments communicated to her by Barnes, rather than directly from her supervisor.[6]

Even accepting Wheeler's allegations as true, we agree with the district court that these actions, whether viewed individually or collectively, are insufficient to constitute an adverse employment action. Defendants' purported failure to provide Wheeler with a personal vehicle or keys to the facility did not result in any significant change in Wheeler's employment status or benefits. Rather, those alleged actions, at most, were a "mere inconvenience" for Wheeler. Sanchez, 164 F.3d at 532. Moreover, as Wheeler herself admits, those inconveniences were largely remedied after she complained about them to BNSF

---

[5] Wheeler never filed a complaint with the EEOC or a state agency making these allegations.

[6] In her complaint, Wheeler also alleged that defendants deprived her of the opportunity to work overtime hours. She has, however, abandoned that allegation on appeal.

20

management.  See Clegg v. Arkansas Dep't of Correction, 496 F.3d 922, 927 (8th Cir. 2007) (rejecting similar claims by plaintiff "that she was not immediately provided with several items she needed" to perform her job, "such as a telephone code and keys to the filing cabinets," both of which "were provided to her as soon as she asked for them").

The same holds true for the other two actions that Wheeler complains about, i.e., the nature of her work assignments and the manner in which those assignments were communicated to her.  Although Wheeler complains that her work assignments in Topeka have required her to work through breaks and lunch periods, she has failed to produce any objective evidence upon which a jury could compare those work assignments to either (a) the work assignments she performed in Lincoln, or (b) to work assignments given to other similarly situated employees at the Topeka facility.  Moreover, it is uncontroverted that she has never been reprimanded by defendants for her work performance.  Likewise, even assuming Wheeler's allegations regarding the manner in which she receives her work assignments are true, there is no indication that her employment status, benefits, or any other material aspect of her employment, was impacted in any way.  See Piercy, 480 F.3d at 1203 (discussing the meaning of "adverse employment action").  Thus, there is simply no objective basis upon which a jury could conclude that Wheeler was subjected by defendants to actionable adverse employment actions.  See Clegg, 496 F.3d at 927 (reaching similar conclusion

21

based on similar facts).

*c) Conclusion*

For these reasons, we conclude that the district court properly granted summary judgment in favor of defendants on Wheeler's claims of discrimination under Title VII and § 1981.

*Wheeler's retaliation claims*

Wheeler also alleged in her complaint that defendants, in violation of Title VII and § 1981, retaliated against her for complaining about alleged race and gender discrimination by failing to transfer her to Topeka after June 2007 (when she first complained about the purported discrimination), and by treating her unfavorably after she returned to Topeka. In other words, Wheeler's retaliation claims are identical to, and thus overlap, two of her five discrimination claims.

To prove her retaliation claims, Wheeler had to establish, in pertinent part, that defendants subjected her to a materially adverse employment action. See Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010) (discussing burden of proof based on McDonnell Douglas framework); Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1225 (10th Cir. 2008) (discussing burden of proof under "mixed-motive" theory of recovery).

The district court in this case, in granting summary judgment in favor of defendants, concluded as a matter of law that Wheeler did not suffer a materially adverse action either after or contemporaneous with the filing of her

22

discrimination complaints. More specifically, the district court concluded, with respect to Wheeler's assertion that defendants retaliated against her by failing to transfer her from Lincoln to Topeka, that Wheeler "cite[d] no objective difference between her painter position in [Lincoln] and the painter position to which she requested transfer to in Topeka in 2007," and that "the record [otherwise] contain[ed] no objective evidence of material disadvantage to" Wheeler. Aplt. App. at 222. Likewise, the district court concluded "that none of [Wheeler's] allegations relative to Barnes," i.e., her allegations that she was treated less favorably than Barnes after she was transferred back to Topeka, "constitute[d] adverse employment action." Id. Wheeler now challenges these conclusions on appeal.

In Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006), the Supreme Court emphasized that the requirement that a plaintiff asserting a retaliation claim have suffered a materially adverse action was intended "to separate significant from trivial harms." In other words, the Court noted, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. Thus, "an employer's actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Semsroth v. City of Wichita, 555 F.3d 1182, 1184 (10th Cir. 2009) (quoting

23

Burlington, 548 U.S. at 57). "[W]hile th[is] standard is sensitive to the particular circumstances of each case, it prescribes an objective inquiry that does not turn on a plaintiff's personal feelings about those circumstances." Id. (internal citations omitted). "Each case is judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (internal quotation marks omitted).

Applying these standards to Wheeler's allegations, we agree with the district court that, as a matter of law, defendants' failure to transfer Wheeler from Lincoln to Topeka between June 2007 and August 2008 did not constitute a materially adverse action. As discussed above in connection with Wheeler's discrimination claims, there is no evidence in the record from which a jury could reasonably find that a painter position in Topeka was objectively more desirable or advantageous than a painter position in Lincoln. Instead, the record on appeal indicates only that Wheeler desired to transfer back to Topeka for subjective reasons.

That leaves Wheeler's allegations that, after returning to Topeka in August 2008, defendants treated her differently than Barnes. The first of those allegations concern defendants' purported failure to provide her with keys to the Topeka facility or her own personal vehicle to use at the facility. We are not persuaded, however, that a jury could reasonably conclude that these actions were "materially adverse" because, although they "may have inconvenienced" Wheeler,

24

"it is unlikely that [they] would have deterred a reasonable employee from making a charge of discrimination." Roney v. Illinois Dep't of Transp., 474 F.3d 455, 461 (7th Cir. 2007) (rejecting similar claim by plaintiff that employer refused to provide him with use of a state vehicle). Moreover, as the district court noted in granting summary judgment in favor of defendants, Wheeler did "not specify [in her district court pleadings] her need for [a] vehicle . . . ." Aplt. App. at 219. Finally, as noted above in the discussion of Wheeler's discrimination claims, it is uncontroverted that Wheeler complained to BNSF about these failures and BNSF responded by providing her both with keys to the facility and a shared vehicle to use. See Somoza, 513 F.3d at 1214 ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the [challenged] actions [we]re sufficiently material and adverse to be actionable."). Thus, in sum, a reasonable jury could not view these alleged actions as materially adverse.

As for Wheeler's allegation that defendants gave her work assignments with unusually short time requirements, we conclude that she failed to provide the district court with sufficient objective evidence to support this allegation. Indeed, the only evidence she cited in support of this allegation was her own deposition transcript, in which she suggested, in cursory fashion and without any supporting documentation, that she was expected to complete painting assignments in a shorter amount of time than her coworkers. Aplt. App. at 141-43. Moreover,

Wheeler conceded in her deposition that when she failed to complete assignments within the time allotted by BNSF, there were no repercussions and that she had never been reprimanded for her performance. Thus, without "objective evidence of material disadvantage," Semsroth, 555 F.3d at 1185, a jury could not have reasonably found that Wheeler's Topeka work assignments constituted materially adverse action.

Lastly, Wheeler's allegation that she received her work assignments indirectly from Barnes, rather than directly from her supervisor, is not sufficiently material and adverse to constitute actionable retaliation. Stated differently, we conclude that this is the type of "petty slight" or "minor annoyance" that the Supreme Court in Burlington indicated was not actionable under Title VII.

Thus, in sum, we conclude the district court properly granted summary judgment in favor of defendants on Wheeler's retaliation claims.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Chief Judge

26